E. GRADY JOLLY, Circuit Judge:
This appeal raises the somewhat technical, yet fact specific question of whether this recipient of federal grants can claim depreciation as an allowable substitute cost. Although somewhat repetitious with other parts of this opinion, the recital of some background initially will place in context the issue we consider.
The Public Works and Economic Development Act bestows on the Secretary of Commerce the authority to make grants for economic development upon application of any state. 42 U.S.C. § 3131(a) (1977). Mississippi sought federal funds to create a nonprofit organization — the Mississippi Institute for Technology Development (“ITD”) — to establish university-affiliated research centers throughout the state to conduct and to transfer scientific research into useful commercial applications. The Mississippi Board of Economic Development had approved a plan for the establishment of ITD, and the state’s government, business, and academic leaders had agreed to fund half of the capitalization of ITD. S.Rep. No. 206, 98th Cong., 1st Sess. 8 (1983). In response to Mississippi’s efforts, the United States Senate Committee on Appropriations, on August 2, 1983, considered the proposal by Mississippi that the federal government contribute funds toward the establishment of ITD. S.Rep. No. 206 at 7. Thereafter, the Committee appropriated funds to the Economic Development Administration (“EDA”) — an agency within the Department of Commerce — to conduct a feasibility study (the “Study”) of Mississippi’s proposal and deferred committing federal funds to support ITD until completion of the Study. Id. On March 30,1984, the independent research firm hired to conduct the Study submitted its results to the Senate, the House of Representatives, and EDA. The Study discussed in detail the feasibility and potential of ITD, the positive economic contributions that would result from ITD’s creation and operation, and the required funding of ITD. Because of the Study’s optimistic predictions, the Committee recommended that Congress appropriate a maximum of twenty million dollars over a four-year period to EDA for the establishment of ITD. S.Rep. No. 570, 98th Cong., 2d Sess. 9 (1984).
After Congress appropriated these funds to EDA, EDA distributed the money to ITD in five separate grants. H.R.Rep. No. 6040, 98th Cong., 2d Sess. (1984). After EDA distributed four of these five grants, the Office of the Inspector General conducted an audit of the grants and recommended that certain costs improperly spent under the grants be disallowed. EDA subsequently accepted this recommendation and disallowed a portion of the costs charged against the federal funds. Applicable regulations, however, provided that when claimed expenses were disallowed, a grantee, such as ITD, could substitute and claim reimbursement for other previously unclaimed “allowable” expenses it may also have incurred in the operation of the sponsored project. Pursuant to these regulations, ITD sought reimbursement for some of the depreciation expenses it had incurred, but had not initially claimed for reimbursement under the grants. EDA rejected the claim for reimbursement under the first four grants. ITD then appealed the decision of EDA to the Assistant Secretary for Economic Development, who also rejected ITD’s depreciation costs, finding reimbursement for depreciation inconsistent with the purpose and terms of the grants. ITD next filed for review in the district court, which affirmed the decision of the Assistant Secretary.
With regard to the fifth and final grant, EDA disallowed various costs, which ITD appealed to the Assistant Secretary. In the administrative appeal, however, ITD did not *447 claim depreciation as a substitute cost. Nevertheless, ITD attempted to raise this claim for depreciation as an allowable substitute cost before the district court. Here, ITD argues that because applicable regulations recognize depreciation as an allowable substitute cost, the district court erred in granting summary judgment in favor of EDA with respect to all five grants. After examining the Grant Agreements between EDA and ITD, the congressional intent underlying these grants, and the provisions of the Study, we hold that the district court erred in affirming the decision of the Assistant Secretary regarding the first four grants. Accordingly, as to these four grants, we reverse and remand for proceedings not inconsistent with this opinion. Because ITD failed to exhaust its administrative remedies on grant five, we affirm the district court’s judgment granting summary judgment in favor of EDA on this final grant.
I
As we have noted, in 1983, Congress appropriated funds to the Economic Development Administration (“EDA”) to conduct a feasibility study (the “Study”) exploring a proposal by Mississippi to provide federal funding for the establishment of the Mississippi Institute for Technology Development (“ITD”). ITD would develop capabilities for transferring scientific research from Mississippi’s universities into useful commercial applications. In 1984, as a result of the Study, Congress appropriated to EDA twenty million dollars to be distributed to ITD through five grant awards over a four-year period.[1] At the end of this time, Congress expected the organization to be self-supporting. Mississippi appropriated most of the additional funds to support ITD.
Before disbursement of each of the five grants, ITD was required to submit to EDA a “Grant Request” containing a budget proposal for spending the federal funds. EDA would respond with a “Demonstration Grant Offer” to ITD, which reflected the extent of and forms of its approval of the Grant Request. ITD’s acceptance of this Offer constituted a “Grant Agreement.” Each Grant Agreement incorporated by reference two documents — ITD’s Grant Request and a document setting out general “Terms and Conditions” of the agreement. These Terms and Conditions required that the grant “be used only for the research project approved by the [EDA] and inconformity with the approved research budget.” Additionally, the Grant Agreements prohibited the use of federal grant funds “to pay for capital assets or other items not treated as expenses under accepted accounting principles.” Finally, in determining the allowability of expenses made by ITD, the Grant Agreements provided that both ITD and EDA would adhere to certain Office of Management and Budget Circulars, including Circular A-122.
In 1988, the Office of Inspector General of the Department of Commerce (the “Inspector General”) conducted an audit of ITD’s first four grants. This draft audit report stated that ITD claimed approximately $4.6 million in unallowable costs in the first four grants and that ITD failed to maintain an accounting system for allocating indirect costs or overhead. In its response to the Inspector General’s audit report, ITD contended that a portion of the disallowed costs in fact were allowable. Additionally, Leonard R. Vernamonti, the president and chief executive officer of ITD, met with the Inspector General auditors and argued that ITD should be allowed to substitute depreciation and claim it as an allowable cost for a portion of these unallowable costs. In March 1990, the Inspector General issued its final audit report on the first four grants and reduced the amount of disallowed costs to $1.9 million. The Inspector General failed, however, to address whether depreciation could serve as an allowable substitute cost. *448 In April 1990, ITD submitted a response to the Inspector General’s final report, again claiming that depreciation should serve as an allowable substitute cost. EDA issued a final audit determination. EDA stated that depreciation was not an allowable cost under these four grants. EDA further reduced, however, the amount of unallowable costs on these grants to $1,362,142.
On November 8, 1990, ITD appealed EDA’s audit determination of the first four grants to L. Joyce Hampers, the Assistant Secretary for Economic Development (“Assistant Secretary”). On August 16, 1991, the Assistant Secretary also denied ITD’s request to substitute depreciation for unallowa-ble costs, explaining that “[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that no one intended that depreciation be charged against the ITD grants”[2] because the grants were intended only to provide start-up or seed funding to ITD. The Assistant Secretary recognized that under Circular A-122 depreciation is generally an allowable cost, but stated that her position was based only on the parties’ intent, not on the “allowableness issue.” She reduced still further, however, the amount due EDA on the first four grants to $1.1 million. ITD submitted additional information to the Assistant Secretary and requested reconsideration, but she maintained her position, stating that depreciation was not intended to be charged to the grants. In somewhat different words from her earlier statement noted above, however, she added that “[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that there is no provision in the grants for depreciation to be charged as a direct cost.”
On August 15, 1991, ITD submitted to EDA a final claim for grant five, which was the last grant disbursed under the appropriations by Congress. ITD included a category for depreciation in this claim but indicated that this cost had been recovered from another funding source. As a result of the Inspector General’s audit of this final grant award, EDA disallowed certain costs claimed (depreciation was not claimed) by ITD. ITD ultimately appealed this decision to the Assistant Secretary, but failed to request that depreciation be substituted for the disallowed costs. In January 1993, the Assistant Secretary agreed with EDA’s audit resolution determination disallowing certain costs claimed by ITD, but, as the issue had not been raised, the Assistant Secretary did not discuss whether depreciation could be substituted for these disallowed costs.
II
On July 10, 1992, ITD filed a complaint in the United States District Court for the Southern District of Mississippi, under the Administrative Procedures Act, 5 U.S.C. §§ 551 et seq., against EDA, the Secretary of Commerce, and various officials at the Department of Commerce. ITD alleged that the Assistant Secretary erred in refusing to allow depreciation as a substitute cost in the first four grants. After receiving the adverse decision in grant five, ITD filed a supplemental complaint raising allegations identical to those argued in the original complaint. After considering the parties’ motion and cross-motion for summary judgment on both the original and supplemental complaint, the district court granted EDA’s motion with respect to both complaints and refused to recognize depreciation as an allowable substitute cost. The court concluded that EDA had correctly determined that the grants were not intended to cover depreciation costs because the grants were intended solely to provide start-up funds towards ITD’s establishment. As to the final grant, *449 the court found that ITD had waived its right to judicial review by failing to exhaust its administrative remedies by raising the issue of depreciation as a substitute cost before the Assistant Secretary. The court went on to hold, however, that summary judgment on the merits in favor of EDA was nevertheless appropriate on grant five, under the same rationale as that given for the first four grants. ITD appeals from this judgment in favor of EDA, dismissing ITD’s case.
On appeal, ITD argues that because under the Grant Agreements and applicable regulations depreciation is an allowable substitute cost, the district court erred in affirming the Assistant Secretary’s decision.[3]
Ill
The sole question presented on appeal is whether in this case, and under the terms of these particular grants, depreciation costs may constitute an allowable substitute for those costs that EDA disallowed.[4] We start with the premise that the terms of a grant agreement are binding on both the grantee and the grantor. United States v. Marion County Sch. Dist., 625 F.2d 607, 609 (5th Cir.1980), cert. denied, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981). Although grant agreements have this contractual aspect, the Supreme Court has further explained that, “[ujnlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.” Bennett v. Kentucky Dep’t. of Educ., 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985). Accordingly, to determine whether depreciation was intended by the parties to be an allowable cost under these grants, we must examine the actual, binding Grant Agreements between ITD and EDA, including the incorporated documents — the Terms and Conditions, the Grant Requests, and Circular A-122 — the legislative history underlying the grants, and the Study ordered by Congress prior to awarding these funds. This examination leads us to the unmistakable conclusion that Circular A-122’s general recognition of depreciation as an allowable indirect cost forms a basic part of the agreement between EDA and ITD, and its terms and provisions are uncontradicted by other record evidence. We will now proceed to demonstrate how we reach our conclusion.
IV
A
Because this is a case on appeal from the district court’s grant of summary judgment, we review the record de novo. Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1412 (5th Cir.1993). Under Rule 56(c) of the Federal Rules of Civil Procedure, we examine evidence presented to determine that there is “no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). Consequently, we are not required to defer to the district court’s factual findings.
“It is well established that an agency’s action must be upheld, if at all, on the basis articulated by the agency itself.” Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). Moreover, we base our review of an administrative action “on the full administrative record that *450 was before the [administrative officer] ... at the time he made his decision.” Milena Ship Management Co. v. Newcomb, 995 F.2d 620, 624 (5th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994). As a general rule, we uphold an agency’s factual findings if they are supported by substantial evidence. Hawkins v. Agricultural Marketing Serv., 10 F.3d 1125, 1128 (5th Cir.1993). Here, however, no testimonial evidence was taken and no issues purely of fact were determined by the agency. In short, we are not reviewing the factual findings of the agency, nor are we reviewing an interpretation of the agency’s own regulations with respect to which it has some expertise. Consequently, in this case we owe no deference to the agency’s determination. Pennzoil Co. v. Federal Energy Regulatory Comm’n., 789 F.2d 1128, 1135 (5th Cir.1986). Unlike factual findings, we review questions of law freely and are under no obligation to defer to the agency’s legal conclusions. Pennzoil, 789 F.2d at 1135 (citing Coca-Cola Co. v. Atchison, Topeka and Santa Fe Ry. Co., 608 F.2d 213, 218 (5th Cir.1979). As our analysis involves the interpretation of regulations of a different agency, congressional policy, and contractual agreements — all of which involve issues of law — our review is effectively de novo. See Snug Harbor, Ltd. v. Zurich Ins., 968 F.2d 538, 541 (5th Cir.1992) (finding question of ordinary contract interpretation generally reviewed de novo).
B
There are a few predicate principles that we need to keep in mind as we consider whether depreciation is an allowable cost under the grants before us:
“The total cost of an award is the sum of the allowable direct and allocable indirect costs less any applicable credits,” not to exceed the total appropriated funds.[5] Office of Management and Budget, Cost Principles for Nonprofit Organizations, Circular No. A-122 att. A § A(l), (CCH) ¶ 18,810.10 (July 8, 1980) [hereinafter OMB Circular No. A-122], Thus, costs under grants, such as the one to ITD, are treated as two broad types — direct and indirect. 2 United States GENERAL AcCounting Office, PRINCIPLES of Federal Appropriations Law 10-75 (2d ed.1992). A direct cost is one that can be “identified specifically with a particular final cost objective: i.e., a.particular award, project, service, or other direct activity of an organization.” OMB Circular No. A-122 att. A § B(l). “Indirect costs are those that have been incurred for common or joint objectives and cannot be readily identified with a particular final cost objective.” Id. at § C(l). Depreciation is a typical example of an indirect cost that is generally allowable. Id. at § C(2). “A grantee may generally substitute other allowable costs for costs which have been disallowed, subject to any applicable cost ceiling. If additional funds become available as the result of a cost disallowance, those funds should be used to pay any ‘excess’ allowable costs which could not be paid previously because of the ceiling.” Principles of Federal Appropriations Law, supra, at 10-75. Generally, a cost is allowable under a grant if it meets the grant purposes. Id. at 10-74. Consequently, a cost that is not for “grant purposes or is contrary to a condition of the grant is not an allowable cost and may not be properly charged against the grant.” Id.
We now turn to examine the Grant Agreements, along with its incorporated documents, between the parties, the congressional intent in appropriating the funds, and the findings of the Study to determine whether depreciation is an allowable substitute cost under the grants.
(1)
Each Grant Agreement between EDA and ITD set forth the amount of each grant and defined the purpose of the award. ITD was awarded a grant “for the purpose of assisting and enabling [ITD] to conduct a demonstration project involving [ITD] operations and additional staffing, planning, and implementation.” As we have earlier noted, this brief and vaguely stated purpose found in each of the approximately one and one-half page Grant Agreements must be understood in the light of ITD’s statement of its purpose: to *451 stimulate technical and economic development in Mississippi by transferring research from its universities into commercial applications. The bare Grant Agreements themselves, however, did not explicitly or implicitly denote depreciation as an allowable or disallowable cost.
Each Grant Agreement incorporated by reference two documents — ITD’s Grant Request and a document setting out general “Terms and Conditions” of the agreement. The Grant Request set out a budget, projecting anticipated operational expenses for each of ITD’s existing divisions and anticipated start-up expenses for new divisions of ITD. The Grant Requests made no reference to depreciation. The Terms and Conditions stated that “[t]he grant can be used only for the research project approved by [EDA] and in conformity with the approved research budget.” The Terms and Conditions also prohibited the use of federal grant funds “to pay for capital assets or other items not treated as expenses under accepted accounting principles.” The Terms and Conditions document, however, does not address the recovery of depreciation expenses.
Most importantly, the Grant Agreements specifically incorporated Office of Management and Budget Circular A-122, which provided that both ITD and EDA were bound to follow the principles of Circular A-122 in determining the allowability of ITD’s expenses. To be allowable, Circular A-122 provides that the costs must “[b]e reasonable for the performance of the award and be allocable thereto under these principles” and “conform to any limitations or exclusions set forth ... in the award.” OMB Circular No. A-122 att. A § A(l), (2)(a). To determine whether a cost is “reasonable,” Circular A-122 directs EDA to consider “[wjhether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award.” Id. at § A(3)(a). Circular A-122 explicitly identifies depreciation as a typical example of an allowable indirect cost. Id. at § C(2). Finally, Circular A-122 provides that when determining the allowability of a particular cost, “[compensation for the use of buildings, other capital improvements and equipment on hand may be made through use allowances or depreciation.” Circular No. A-122 att. B § C(9).
In short, although the Grant Agreements, Grant Requests, and Terms and Conditions do not specifically refer to depreciation as an allowable cost under these grants, Circular A-122 clearly recognizes depreciation as an allowable cost and approves depreciation as a method for compensating for use of an asset.
(2)
We next turn to discuss the congressional intent behind the appropriation of these grant funds. After receiving favorable feedback from the Study that it had commissioned, Congress appropriated money “toward establishment of the Institute.” S.Rep. No. 570, 98th Cong., 2d Sess. 9 (1984). In its report recommending funding, the Senate Appropriations Committee explained that it expected to provide no more than twenty million dollars over a four-year period for a “demonstration project” that would coordinate several research centers in Mississippi “to contract for research and development work that should lead to technology transfer benefits for State and regional industries.” S.Rep.No. 570. The Senate explained that ITD should be self-supporting by the end of the four-year period. Id. In the next two appropriation bills, Congress approved grants “consistent” with its original appropriation. S.Rep. No. 150, 99th Cong., 1st Sess. 7 (1985); S.Rep. No. 425, 99th Cong., 2d Sess. 9 (1986). In the following appropriation, Congress expressly stipulated that no grant funds could be used for a specific category of costs — “attorneys’ or consultants’ fees in connection with securing grants and contracts” from EDA. H.R.J.Res. 395,100th Cong., 1st Sess., 101 Stat; 1329-2 (1987).
In sum, neither the appropriation laws nor the corresponding legislative histories address specifically whether ITD’s grants could be used to cover depreciation.
(3)
As we have noted, before Congress funded this proposal and before EDA and ITD executed the Grant Agreements, Congress approved funds for EDA to conduct the Study, *452 which examined the appropriateness of federal funding. The Study defined ITD’s funding requirements as “start-up funds, ongoing support funds, project development funds, outside investment funds, and funds for technology assistance.” The Study proposed that federal funds be allocated to pay for “a portion of the start-up funds over a five-year period,” while state money would pay for “start-up funds and ongoing support.” The Study defined “start-up funds” as the money needed “to pay for the services of the key staff who must be recruited for ITD central and the individual centers, initial office and equipment requirements for both, and expenses incurred in initial efforts to establish ITD and its center as potential recipients of government and industry R & D grants.” (emphasis added). The Study provided no discussion or recommendation, however, on the payment of depreciation expenses.
V
Having reviewed the relevant evidence and legal principles relating to the issue before us, we now come to our analysis. First we note that the efforts that ITD has made in its attempt to claim all appropriated funds appears to be congruous with and according to the regulations. When costs are disallowed, as was the case here, and appropriated funds have not been exhausted, the grantee is permitted under the regulations to substitute a cost that it had not claimed for that disallowed cost. The substitute cost, of course, must be one that is allowable under the regulations. Thus, because unexhausted funds remain in the ITD appropriations, ITD had a right under the regulations to claim a substitute cost.[6] Accordingly, it claimed its costs of depreciation. The only question before us, therefore, is whether depreciation may be such an allowable substitute cost.
Ruling on this question, the Assistant Secretary acknowledged that depreciation is an allowable cost generally under Circular A-122, but she said that her decision denying depreciation was based on the parties’ intent. Furthermore, when the Assistant Secretary ruled on ITD’s motion for reconsideration, she said “[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that there is no provision in the grants for depreciation to be charged as a direct cost.” The only way we can read this cryptic reasoning is as the district court did: support for her position that the parties did not intend to charge depreciation against the grants because initially it was not claimed as a cost.[7] The only evidence from which the intent of the parties can be gleaned, however, is from the Grant Agreements, Grant Requests, Terms and Conditions, Circular A-122, from the legislative history underlying the appropriations, and from the Study. Our earlier review of each of these documents determined that there is no evidence that depreciation was not intended to be an allowable substitute cost under these grants.
Yet, Circular A-122 clearly recognizes depreciation as an allowable cost and, as part of the contract between the parties, is binding on EDA and ITD in the absence of a contrary expression. To be sure, Circular A-122 is the only record evidence addressing depreciation. Because Circular A-122 is part of the contract between the parties and because we find no evidence of the parties’ intent that would justify disregarding its clear statement, we hold that depreciation may be an allowable substitute cost under these grants.
Accordingly, we REVERSE the judgment of the district court as to the first four grants *453 and REMAND for farther proceedings not inconsistent with our opinion. As to grant five, we AFFIRM the district court because ITD waived its right to judicial review by failing to raise the issue of depreciation before the Assistant Secretary. For the foregoing reasons, the judgment of the district court is
AFFIRMED in part and REVERSED and REMANDED in part.[8]

. From the first appropriation of seven million dollars, EDA awarded ITD a grant for two million dollars in January 1985 and a grant for five million dollars in September 1985. In September 1986, from the second appropriation of six million dollars, EDA awarded ITD a grant of six million dollars. In September 1987, from the third appropriation of four million dollars, EDA awarded ITD slightly less than four million dollars, with the remainder paying for the Study. Finally, in 1988, from the fourth appropriation of three million dollars, EDA awarded ITD a grant of three million dollars.

. The Assistant Secretary determined the parties’ intent only from an examination of the documents in the record. The Assistant Secretary noted that these particular grants prohibited the use of grant funds to pay for the purchase of capital assets. Awarding depreciation costs to ITD, the Assistant Secretary concluded, would effectively require EDA to pay for assets already paid for by Mississippi. This view, however, is contradicted by the Study, which proposed that federal funds be allocated to pay for “initial office and equipment requirements” for ITD. See infra § IV(B)(3), p. 452. Although the grants do prohibit the purchase of these assets from federal funds, Circular A-122 provides that compensation for the use of these assets could be made by depreciation. Circular A-122 att. B § C(9); see infra § IV(B)(1), pp. 451-52.

. EDA argues that ITD has waived its right to judicial review of grant five because of its failure to raise the issue of substituting depreciation for disallowed costs to the Assistant Secretary. In fact, the district court ruled that ITD waived its right to judicial review. We affirm the district court on this point. Because ITD failed to raise the issue of depreciation with respect to the final grant before the Assistant Secretary, ITD is foreclosed from raising it here. Texas v. United States, 866 F.2d 1546, 1561 (5th Cir.1989). Consequently, we will limit our review to ITD's first four grants.

. The issue is narrowed by delineating what is not at issue on this appeal: ITD does not complain that the costs that EDA disallowed should have been allowed, but argues only that it should be allowed to substitute depreciation costs in place of these unallowable costs; EDA does not dispute that ITD has the right to substitute allowable costs for disallowed costs, but only contends that depreciation in this case is not an allowable substitute cost. Finally, in this case, we decide only that under the terms of the grants depreciation may be an allowable substitute cost.

. We interpret this statement to mean that a grantee can charge both allowable direct and allocable indirect costs against the grant until he recovers the total amount of appropriated funds.

. We reiterate that substitute costs on a particular grant are only allowable up to the total amount of that grant. The Assistant Secretary pointed out in her opinion to response to ITD's motion for reconsideration that costs equal to the entire award for the fourth grant were accepted and thus no substitute costs would be allowed. This consideration, of course, would be relevant in the district court's determination of the amount ITD will be allowed to claim for depreciation as a substitute cost.

. It seems to us that such an observation disregards the very nature of a substitute cost. One would hardly expect to find a provision for a substitute cost in the initial grant papers; it is only after a cost reflected in the grant papers has been disallowed that a claim for a substitute cost arises.

. It is rather clear that the majority and the dissent have a fundamentally different concept of the issue presented in this case. The majority views the question as whether depreciation is an allowable substitute cost under these grants. The dissent, however, concludes that because ITD failed to claim depreciation originally in its Grant Requests, ITD cannot now claim depreciation as an allowable cost, substitute or otherwise.
The majority opinion does not stand for the proposition that any and all depreciation costs submitted by ITD are automatically allowable substitute costs. We hold only that depreciation may be an allowable substitute cost under these grants and that the parties did not intend otherwise. Whether individual claims of depreciation are allowable substitute costs is another question. On remand, the burden will plainly rest on ITD to prove that it is entitled to each claim of depreciation it asserts. It is thus clear that the district court will be free to examine to what extent depreciation may be allowed as a substitute cost on the various claims of ITD. In this connection, the district court, of course, may fully consider whether adequate records support ITD's claimed depreciation costs.