# United States Court of Appeals
## for the Federal Circuit

---

CMS CONTRACT MANAGEMENT SERVICES,
THE HOUSING AUTHORITY OF THE CITY OF
BREMERTON, NATIONAL HOUSING
COMPLIANCE, ASSISTED HOUSING SERVICES
CORP., NORTH TAMPA HOUSING DEVELOPMENT
CORP., CALIFORNIA AFFORDABLE HOUSING
INITIATIVES, INC., SOUTHWEST HOUSING
COMPLIANCE CORPORATION, AND NAVIGATE
AFFORDABLE HOUSING PARTNERS
**(formerly known as Jefferson County Assisted
Housing Corporation),**
*Plaintiffs-Appellants,*

**v.**

MASSACHUSETTS HOUSING FINANCE AGENCY,
*Plaintiff-Appellee,*

**v.**

UNITED STATES,
*Defendant-Appellee.*

---

2013-5093

---

Appeal from the United States Court of Federal Claims in consolidated Nos. 12-CV-0852, 12-CV-0853, 12-CV-0862, 12-CV-0864, and 12-CV-0869, Judge Thomas C. Wheeler.

---

Decided:  March 25, 2014

_____

ROBERT K. TOMPKINS, Patton Boggs LLP, of Washington, DC, argued for all plaintiffs-appellants.  With him on the brief were MICHAEL  J. SCHAENGOLD and ELIZABETH M. GILL.  Of counsel on the brief were COLM P. NELSON, Foster Pepper PLLC, of Seattle, Washington, for CMS Contract Management Services and The Housing Authority of The City of Bremerton; and MICHAEL GOLDEN, Pepper Hamilton LLP, of Washington, DC, for National Housing Compliance; NEIL H. O'DONNELL, Rogers, Joseph, O'Donnell, of San Francisco, California, for Assisted Housing Services Corp., North Tampa Housing Development Corp. and California Affordable Housing Initiatives, Inc.; and  RICHARD JAMES VACURA, Morrison & Foerster, LLP, of McLean, Virginia, for Southwest Housing Compliance Corp.  Of counsel was WILLIAM GREGORY GUEDEL, Foster Pepper PPLC, of Seattle, Washington, for  CMS Contract Management Services.

GABRIEL E. KENNON, Cohen Mohr LLP, of Washington, DC, for plaintiff-appellee Massachusetts Housing Finance Agency.  Of counsel was ANDREW J. MOHR.

KIRK T. MANHARDT, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, and JEANNE E. DAVIDSON, Director.   Of counsel on the brief were DOUGLAS K. MICKLE, Senior Trial Counsel, and JOSEPH A. PIXLEY, Trial Attorney, DORIS S. FINNERMAN, Assistant General Counsel for Assisted Housing and Civil Rights, Office of General Counsel, and KATHIE SOROKA, Special Assistant to the General Counsel, Office of General Coun-

sel, United States Department of Housing and Urban Development, of Washington, DC.

KEVIN P. MULLEN, Jenner & Block, LLP, of Washington, DC, for amicus curiae.

————————————

Before RADER, *Chief Judge,* LOURIE, and MOORE, *Circuit Judges.*

RADER, *Chief Judge.*

The Court of Federal Claims denied CMS Management Services et al.'s (Appellants) request to set aside as unlawful the Department of Housing and Urban Development's (HUD) solicitation and award of contract administration services related to Section 8 of the Housing Act. Because the Performance-Based Annual Contribution Contracts (PBACCs) are procurement contracts, not cooperative agreements, this court reverses.

## I.

The Federal Grant and Cooperative Agreement Act (FGCAA) sets forth the type of legal instrument an executive agency must use when awarding a federal grant or contract. 31 U.S.C. § 6301. In pertinent part, "[a]n executive agency shall use a procurement contract as the legal instrument . . . when . . . the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States government." 31 U.S.C. § 6303. When using a procurement contract, an agency must adhere to federal procurement laws, including the Competition in Contracting Act (CICA), 41 U.S.C. § 3301, as well as the Federal Acquisition Regulation (FAR).

In contrast, an "agency shall use a cooperative agreement as the legal instrument . . . when . . . the principal purpose of the relationship is to transfer a thing of value

to the [recipient] to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring . . . property or services." 31 U.S.C. § 6305. The FGCAA notes that "substantial involvement is expected between the executive agency and the [recipient] when carrying out the activity contemplated in the [cooperative] agreement." 31 U.S.C. § 6305(2). When using a cooperative agreement, agencies escape the requirements of federal procurement law.

## II.

Section 8 of the Housing Act of 1937 authorized HUD to provide rental assistance benefits to low-income families and individuals. These benefits included payments to owners of privately-owned dwellings (project owners) to subsidize the cost of rent. Traditionally, HUD entered into Housing Assistance Program contracts (HAP contracts) directly with project owners and paid the subsidies directly. However, the 1974 amendment to the Housing Act gave HUD a second option—to enter into an Annual Contributions contract (ACC) with a Public Housing Agency (PHA). The PHA would then enter into HAP contracts with project owners. HUD provided the PHAs funds to pay the subsidies to the project owners. A PHA is a "State, county, municipality, or other governmental entity or public body . . . authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A). The parties agree that Appellants are PHAs.

Under the 1974 amendment, HUD entered into approximately 21,000 HAP contracts directly with project owners and 4,200 ACCs with PHAs. J.A. 300/A.R. 428. However, in 1983, a new Act repealed HUD's authority to enter into new HAP contracts (either directly with project owners or through PHAs) for new constructions of dwellings or substantial rehabilitations. Pub. L. No. 98-181, § 209, 97 Stat. 1153, 1183 (1983). HUD retained authori-

ty to administer existing HAP contracts, as well as enter into new HAP contracts for existing Section 8 dwellings. However, to enter into a new HAP contract, HUD had to engage a PHA unless "no [PHA] has been organized or [if] the Secretary determines that a [PHA] is unable to [implement the Section 8 program]." 42 U.S.C. § 1437f(b)(1). If no PHAs were available, HUD could then contract directly with project owners. *Id.*

In 1997, when many of the HAP contracts under the 1974 amendment were beginning to expire, Congress enacted the Multifamily Assisted Housing Reform and Affordability Act (MAHRA), which permitted HUD to renew existing HAP contracts. MAHRA defined "renewal" as the "replacement of an expiring Federal rental contract with a new contract." MAHRA § 512(12); *CMS Contract Mgmt. Servs. v. United States*, 110 Fed. Cl. 537, 556 (2013). MAHRA was enacted at a time when HUD was facing extensive budget cuts. It had just announced a plan to reduce staff by one-third by the end 2000. J.A. 300/A.R. 2766–67. MAHRA's "Findings and Purposes" noted that HUD "lacks the ability to ensure the continued economic and physical well-being of the stock of federally insured and assisted multifamily housing projects." MAHRA § 511(10). Thus the 1997 Act addressed this problem through "reforms that transfer and share many of the loan and contract administration functions and responsibilities of the Secretary to and with capable State, local, and other entities." MAHRA § 511(11)(C).

Accordingly, HUD began to outsource certain contract administration services. In its budget request for the fiscal year 2000, HUD sought an additional $209 million in federal funding to pay for this outsourcing program. J.A. 300/A.R. 256. HUD noted that outsourcing contract administration services will "improve the oversight of HUD's project-based program" and that it "plans to procure the services of contract administrators to assume many of these specific duties, in order to release HUD

staff for those duties that only government can perform and to increase accountability for subsidy payments." J.A. 300/A.R. 259. While outsourcing these services, HUD still had the obligation under the 1983 amendment to engage a PHA for any new HAP contracts.

Thus, on May 19, 1999, HUD initiated a nationwide competition to award an ACC to a PHA in each of the 50 States (California was allotted two ACCs), plus the District of Columbia and the Commonwealth of Puerto Rico. The ACCs were performance-based; that is, in addition to "basic" administrative fees, PHAs could earn "incentive" fees by entering into HAP contracts beyond the number specified in their contract. J.A. 300/A.R. 435–36. With existing HAP contracts, HUD's Request for Proposals (RFP) stated that it would assign such contracts to the PHA, and that "the PHA [would] assume[] all contractual rights and responsibilities of HUD pursuant to such HAP contracts." J.A. 300/A.R. 449. The RFP also specified that HUD would evaluate proposals "to determine which offerors represent the best overall value, including administrative efficiency, to the Department." J.A. 300/A.R. 442. Lastly, the RFP stated that "[t]his solicitation is not a formal procurement within the meaning of the Federal Acquisition Regulations (FAR) but will follow many of those principles." J.A. 300/A.R. 428.

In response to the 1999 competition, HUD awarded 37 of the PBACCs. PBACCs were awarded in the remaining jurisdictions through later competitions. PHAs administering these PBACCs assumed the title of Performance-Based Contract Administrators (PBCAs).

On February 25, 2011, HUD chose to re-compete the PBACCs to ensure that the "Government was getting the best value." J.A. 300/A.R. 676. Many PBCAs adamantly opposed HUD's decision to re-compete and requested that, at a minimum, incumbent PBCAs get priority consideration. HUD denied this request on the ground that stricter

competition would lead to greater savings for the government. J.A. 300/A.R. 676. In July 2011, HUD announced awards for all jurisdictions and stated that its decision to re-compete the PBACCs saved HUD more than $100 million per year. J.A. 6222.

Appellants were awarded multiple contracts in multiple states; however, a number of other PBCAs and PHAs were not as fortunate. This led to a total of 66 post-award protests being filed with the Government Accountability Office (GAO). Among other things, protestors argued that the PBACCs were procurement contracts and that HUD had not complied with federal procurement laws. *CMS*, 110 Fed. Cl. at 548-50. In response, HUD notified the GAO that it was going to withdraw the awards for the protested contracts and "evaluate and revise its competitive award process for the selection of [PBCAs]." J.A. 300/A.R. 2843. Accordingly, the GAO dismissed the protests as moot. *Id.*

On March 9, 2012, HUD re-issued its solicitation for competition. However, for the first time, HUD expressly characterized the PBACCs as cooperative agreements, and thus, outside the scope of federal procurement law. J.A. 300/A.R. 85. In particular, HUD labeled the solicitation as a "Notice of Funding Availability" (NOFA), *id.*, a term typically reserved for cooperative agreements. HUD also announced that it was choosing not to allow PBCAs (including Appellants) to compete for PBACCs outside their home states:

> HUD will consider applications from out-of-State applicants only for States for which HUD does not receive an application from a legally qualified in-State applicant. Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that State.

J.A. 300/A.R. 82.

This change in policy excluded from consideration many applicants, including Appellants, who HUD previously determined in 2011 provided the government the best value. HUD acknowledged that "nothing in the 1937 [Housing] Act prohibits [Appellants] . . . from acting as a PHA in a foreign state." *Id.* Appellants observed that no change in law or in program requirements required HUD to revise its practice. Thus, in May 2012, Appellants filed pre-award protests with the GAO, arguing that the PBACCs under the NOFA are procurement contracts and thus subject to federal procurement laws, and that the NOFA's anticompetitive provisions are unreasonable. J.A. 300/A.R. 2852.

III.

The GAO agreed with Appellants that the PBACCs are procurement contracts. It rejected HUD's argument that the PBACCs "transfer a thing of value" under 31 U.S.C. § 6305 merely because HUD is required to provide funds to the PHAs to make subsidy payments to project owners. The GAO found that, although the payments are made through a depository account to the PBCAs, the PBCAs have no rights to, or control over, the payments and that any excess funds and interest earned on those funds must be remitted to HUD or invested on its behalf. J.A. 300/A.R. 2849.

The GAO also rejected HUD's argument that the administrative fees paid to the PBCAs qualify as a "transfer [of] a thing of value." The GAO found that the purpose of the fee was not to assist the PHAs in carrying out a public purpose. "Rather, . . . the administrative fees are paid to the PHAs as compensation for . . . administering the HAP contracts." J.A. 300/A.R. 2849–50. In other words, the fees merely cover the PHAs' operating expenses.

The GAO determined that "the circumstances here most closely resemble the intermediary or third party situation," J.A. 300/A.R. 2850, "where the recipient of an award [i.e., a PBCA] is not receiving assistance from the federal agency but is merely used to provide a service to another entity which is eligible for assistance." S. Rep. No. 97-180, at 5 (1981); J.A. 300/A.R. 2850. "The choice of instrument for an intermediary relationship depends solely on the principal federal purpose in the relationship with the intermediary." S. Rep. No. 97-180, at 5 (1981). In this regard, the GAO concluded:

> [T]he asserted "public purpose" provided by the PHAs under the NOFA—the administration of HAP contracts—is essentially the same purpose HUD is required to accomplish under the terms of its HAP contracts, wherein HUD is ultimately obligated to the property owners. As such, the principal purpose of the NOFA and ACCs to be awarded under the NOFA is for HUD's direct benefit and use.

J.A. 300/A.R. 2851.

Thus, the GAO held that the PBACCs are procurement contracts. Specifically, these agreements procure the contract administration services of the PBCAs. Because HUD conceded that it did not adhere to federal procurement laws, the GAO recommended that HUD cancel the NOFA and properly re-solicit the contract administration services. J.A. 300/A.R. 2852.

However, on December 3, 2012, HUD announced on its website that "[t]he Department has decided to move forward with the 2012 PBCA NOFA and plans to announce awards on December 14, 2012." J.A. 300/A.R. 9. An agency's decision to disregard a GAO recommendation is exceedingly rare. The Court of Federal Claims has explained that it "give[s] due weight and deference" to GAO recommendations "given the GAO's long experience

and special expertise in such bid protest matters." *Baird Corp. v. United States*, 1 Cl. Ct. 662, 668 (1983). Appellants cite evidence that from 1997–2012, the GAO issued 5,703 merit decisions and sustained 1099 protests; during that period, an agency disregarded the GAO's recommendation only ten times. Appellant Br. 26 n.6.

Soon after HUD's announcement, Appellants filed pre-award protests in the Court of Federal Claims asking it to enjoin HUD from proceeding with the NOFA. Appellants argued that the PBACCs under the NOFA are procurement contracts, and that, even if the PBACCs are cooperative agreements, the NOFA's anticompetitive provisions are arbitrary and capricious under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A).

The Court of Federal Claims ruled in favor of HUD. It reasoned that HUD was "unburdened by any statutory or regulatory obligation to maintain [HAP contracts] going forward in perpetuity," and that "[c]onsistent with the policy goals set forth in the Housing Act, HUD . . . enlisted the states and their political subdivisions, the PHAs, to take on greater program responsibility." *CMS*, 110 Fed. Cl. at 563. The trial court also held that the fact that "HUD achieved certain cost savings in so doing does not convert the PBCA program into a procurement process that primarily benefits HUD, as opposed to the recipients of the Section 8 assistance." *Id.* The Court of Federal Claims did not address Appellants' argument that the NOFA's anticompetitive provisions are arbitrary and capricious under the APA.

Appellants appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## IV.

This court reviews the trial court's legal determinations de novo and its factual determinations for clear error. *PAI Corp. v. United States*, 614 F.3d 1347, 1351

(Fed. Cir. 2010). Whether a contract is a procurement contract or a cooperative agreement is a question of law. *Maint. Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984). On appeal, Appellants argue that the Court of Federal Claims erred in holding that the PBACCs at issue are cooperative agreements, as opposed to procurement contracts. They also argue that, in any event, the trial court erred by failing to address whether the NOFA's anticompetitive provisions are arbitrary and capricious under the APA.

With respect to Appellants' first argument, this court agrees with Appellants that the PBAACs are procurement contracts and not cooperative agreements. Based on this record, the primary purpose of the PBACCs is to procure the services of the PBCAs to support HUD's staff and provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance. For example, the PBCA outsourcing program was created in response to federal budget restraints and sought to "improve the oversight of HUD's project-based program." J.A. 300/A.R. 253. HUD acknowledged its intention "to *procure* the services of contract administrators to assume many of these specific duties, in order to release HUD staff for those duties that only government can perform and to increase accountability for subsidy payments." J.A. 300/A.R. 259 (emphasis added). HUD also acknowledged that due to "major staff downsizing . . . HUD sought new ways to conduct *its* business[,] such as the Request for Proposals for outside contractors to administer HUD's portfolio of Section 8 contract[s]." J.A. 300/A.R. 3764 (emphasis added).

The record in this case also shows that HUD's 1999 RFP, which contains substantially similar terms as the 2011 and 2012 competitions, stated that it "pays billions of dollars annually to [project owners and] seeks to improve its performance of the management and operations of this function through this RFP." J.A 300/A.R. 428. The

RFP added that it would evaluate the proposals "to determine which offerors represent the best overall value . . . *to the Department.*" J.A. 300/A.R. 442 (emphasis added). And, as recently as 2013, HUD has acknowledged that "PBCAs have helped make HUD a leader among Federal agencies in reducing improper payments," J.A. 300/A.R. 1963, and that "PBCAs are integral to the Department's efforts to be more effective and efficient in the oversight and monitoring of this program." J.A.300/A.R. 1960. HUD has also consistently described the role of the PBCAs as "support" for HUD's Field Staff. J.A. 300/A.R. 1964 ("Field Staff perform the following functions, with support from PBCA's, to administer the [program] . . . .").

The record belies HUD's argument that the housing assistance payments it makes to the PBCAs are a "thing of a value" within the ambit of 31 U.S.C. § 6305. HUD has a legal obligation to provide project owners with housing assistance payments under the HAP contracts. *See* J.A. 300/A.R. 2276. Transferring funds to the PBCAs to transfer to the project owners is not conferring anything of value on the PBCAs, especially where the PBCAs have no rights to, or control over, those funds. Moreover, the PBCAs must remit any excess funds and interest earned back to HUD. J.A. 300/A.R. 2849.

Likewise, the administrative fee paid to the PBCAs do not constitute a "thing of value" either. While money can be a "thing of value" under 31 U.S.C. § 6305 in certain circumstances, the administrative fee here appears only to cover the operating expenses of administering HAP contracts on behalf of HUD.

At most, HUD has merely created an intermediary relationship with the PBCAs "[w]here the [PBCAs are] not receiving assistance from the federal agency but [are] merely used to provide a service to another entity which is eligible for assistance." S. Rep. No. 97-180, at 5 (1981). "The fact that the product or service produced by the

intermediary may benefit another party is irrelevant." *Id.* In the case of an intermediary relationship, "the proper instrument is a procurement contract." *Id.*

## V.

Because the PBACCs at issue are procurement contracts, and because HUD concedes it did not comply with federal procurement laws, the decision of the Court of Federal Claims must be reversed and remanded for disposition consistent with this opinion. This court does not reach Appellants' argument that the PBACC's anti-competitive requirements are arbitrary and capricious under the APA.

**REVERSED AND REMANDED**