STOLL, Circuit Judge,
dissenting.
In CMS Contract Management Services v. Massachusetts Housing Finance Agency, we emphasized that when the principal purpose of an agreement is to procure services of a third party to help an agency achieve its mission, the proper instrument under the Federal Grant and Cooperative Agreement Act (“FGCAA”) is a procurement contract. 745 F.3d 1379 (Fed.Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 1842, 191 L.Ed.2d 723 (2015). The FGCAA instructs that executive agencies “shall use” a procurement contract when the statutory criterion is met, as it was in this ease. See 31 U.S.C. § 6303. Here, the United States Department of the Interior’s Fish and Wildlife Service (“the Service”) used cooperative farming agreements (“CFAs”) to obtain farming services so that migratory birds, which the Service is obligated to protect, would be fed. The record shows that the Service would have performed this task itself had it not contracted with third-party farmers. Based on this record, the principle purpose of the CFAs was to acquire farming services to feed migratory birds, so the Service was compelled to use a procurement contract, not a cooperative agreement, when entering into the CFAs. Yet, the majority defers to the Service’s decision on whether to use a procurement contract or a cooperative agreement for the CFAs. Such an approach is incompatible with our decision in CMS and departs from the plain language of the statute. I respectfully dissent.
I.
We explained in CMS that the FGCAA “sets forth the type of legal instrument an executive agency must use when awarding a federal grant or contract.” CMS, 745 F.3d at 1381. Moreover, we indicated in CMS that “[w]hether a contract is a procurement contract or a cooperative agreement is a question of law,” which we review de novo. Id. at 1385 (citing Maint. Eng’rs v. United States, 749 F.2d 724, 726 n. 3 (Fed.Cir.1984) (“Determination of the type of contract is a matter of law — not controlled by a label in the contract.”)). In my view, CMS is squarely on point with the facts of this case and controls the outcome.
*1331 In CMS, we reviewed agreements that the Department of Housing and Urban Development (“HUD”) had entered into with local public housing authorities for compliance with the FGCAA. CMS, 745 F.3d at 1381. Those agreements had the local housing authorities administer contract payments with housing project owners rather than HUD, which had traditionally administered such payments. HUD both provided the local housing authorities with funds for paying the project owners and paid the local housing authorities an operating fee for their services.. HUD characterized the agreements at issue as “cooperative agreements.” CMS, Joint App’x at AR85.
Responding to protests filed by non-selected local housing authorities, we looked to the primary, or principal, purpose of the agreements, as commanded by the statutory text. See 31 U.S.C. §§ 6303, 6305. We held that “the primary purpose of the [HUD agreements] is to procure the services of the [local housing authorities] to support HUD’s staff and provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance.” CMS, 745 F.3d at 1385. Citing the record, we explained that HUD entered into the contracts with local housing authorities so that HUD staff — who would otherwise be responsible for administering payments to project owners — could focus on other tasks. Id. We recognized that by providing a service on behalf of HUD, the local housing authorities had formed an intermediary relationship with HUD, and concluded that, “in the case of an intermediary relationship, the proper instrument is a procurement contract.” Id. at 1386 (internal quotation marks omitted).
Here, the Claims Court determined that the principal purpose of the CFAs was to assist the Service in fulfilling its mission to feed migratory birds:
In this case, the intended beneficiaries are the migratory birds and wildlife on the refuges. The farmer-cooperators are intermediaries. The Administrative Record demonstrates that the Service contracted with farmer-cooperators, not to benefit them financially, but to obtain their services to provide food for migratory birds and wildlife, in exchange for the farmers’ personal use of public-owned lands.
Hymas v. United States, 117 Fed.Cl. 466, 487 (2014).
The record confirms the Claims Court’s determination. In administering the National Wildlife Refuge System, the Service has a mission to “provide for the conservation of fish, wildlife, and plants, and their habitats within the System.” 16 U.S.C. § 668dd(a)(4)(A). To fulfill its mission, the Service is required to generate and comply with a comprehensive plan for managing the refuges under its control. 16 U.S.C. § 668dd(e). The comprehensive plan the Service established for the McNary and Umatilla Refuges indicates that “cropland farming management is a critical Refuge operation in meeting purposes of the Refuge,” including purposes such as “waterfowl management.” J.A. 162-63. Further, the Service’s cropland management plans explain that croplands on the Refuges are “primarily managed for the benefit of waterfowl.” J.A. 74, 92.
With that mission in mind, the Service contemplated three alternative options for cropland farming on the Refuges. Under the first option, the Service staff would produce crops. Specifically, “all crop production would be conducted by Refuge staff and all costs associated with farming (water, seed, fertilizer, etc.) paid for with Refuge funds.” J.A. 77, 96. The two other options involved third parties, with the Service contracting with farmers to cultivate the land and provide crops for the *1332 birds in exchange for either pay or, as in the CFAs at issue in this case, crops.
The Service’s plans go on to describe a .CFA as “a negotiated agreement between the Refuge and private farmer to produce crops for both parties.” J.A. 79, 98 (emphasis added). “In return” for bearing the costs of production and “producing a specified amount of crops for the Refuge, the [farmer] is allowed to harvest and sell the remaining crops.” Id. To provide sufficient crops for the farmer to take as his own, CFAs require the Service' to cede much more land to farmers than the farm-for-pay option, which shows that the difference between option two — paying the farmers money in exchange for farming— and option three — paying the farmers share in crops in exchange for farming — is not a meaningful one.
Based on the record before us, the Claims Court did not err in concluding that the principal purpose of the CFAs is to “acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government.” 31 U.S.C. § 6303 (emphasis added). Similar to the agreements in CMS, for which we found that the local housing authorities were “merely used to provide a service to another entity which is eligible for assistance,” the CFAs here engage third-party farmers merely as intermediaries that help the Service fulfill its mission of feeding migratory birds. CMS, 745 F.3d at 1386. Also as in CMS, but for the farmers, the Service would have undertaken the contracted-for service itself. Furthermore, the crop management plans’ description of cooperative agreements being “negotiated” and of the farmer receiving a portion of the harvested crops “in return” for his services strongly suggests a quid pro quo relationship. J.A. 79, 98. These facts indicate that the CFAs embodied Service acquisitions, not a transfer of a thing of value as the Service argues.
II.
Despite the majority’s assertions to the contrary, the FGCAA does not grant agencies flexibility in determining when to use a particular instrument in government contracting. Quite the opposite, the statute directs that an executive agency:
shall use a procurement contract as the legal instrument ... when the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government.
31 U.S.C. § 6303 (emphasis added).
It is well-established that “shall” is ordinarily the language of statutory command; it is not generally permissive or subject to agency interpretation. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (“[T]he mandatory ‘shall’ normally creates an obligation impervious to judicial discretion.”); see also Alabama v. Bozeman, 533 U.S. 146, 153, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) (“The word ‘shall’ is ordinarily the language of command.”) (quoting Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947)); Miller v. French, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (refusing to interpret the mandatory term “shall” as permissive). It is also true that in construing statutes, “[w]e must enforce plain and unambiguous- statutory language according to its terms.” Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010). This clear statutory text belies the majority’s conclusion that “Congress did not require the use of particular instruments in particular situations.” Maj. Op. 1329 (emphasis in original).
*1333 Another central precept of statutory interpretation warns that when “[gjiven [a] straightforward statutory command, there is no reason to resort to legislative history.” United States v. Gonzales, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). With this in mind, the majority’s approach of relying on legislative history to discern the FGCAA’s intended purpose, rather than applying the statute’s unambiguous command, is misguided. But even if the statute were unclear, there would be no need to resort to legislative history because the FGCAA itself states its purpose: to “prescribe criteria for executive agencies in selecting appropriate legal instruments.” 31 U.S.C. § 6301(2) (emphasis added); see Black’s Law Dictionary 1373 (10th ed.2014) (defining “prescribe” as “to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)”).
Thus, because the principle purpose of the CFAs aligns with the criterion outlined in 31 U.S.C. § 6305, it is incorrect for the majority to assert that Congress “left a gap for agencies to fill” when determining what legal instrument to use. Maj. Op. 1329. For if “Congress has spoken clearly on the disputed question, then ‘that is the end of the matter’ ” and there is no gap for the Service to fill. City of Arlington v. FCC, — U.S. -, 133 S.Ct. 1863, 1875, — L.Ed.2d - (2013) (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694, (1984)). Applying that teaching to this case, the Service should not receive deference to its choice of legal instrument for entering into the CFAs with farmers. Because the Claims Court ¡properly concluded that the principal purpose of the CFAs is to “acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government,” the FGCAA instructs that a procurement contract should be used. 31 U.S.C. § 6303.
Conclusion
Given our interpretive guidance in CMS and the plainly worded command of the FGCAA, I would uphold the Claims Court’s determination that the CFAs at issue here must be entered into as procurement contracts, giving the Claims Court subject matter jurisdiction under the Tucker Act and subjecting the CFAs to federal procurement laws such as the CICA. For the' foregoing reasons, I respectfully dissent.