# United States Court of Appeals for the Federal Circuit

---

**JAY HYMAS, d/b/a DOSMEN FARMS,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2014-5150

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00291-SGB, Judge Susan G. Braden.

---

Decided: January 14, 2016

---

JAMES P. SCHAEFER, Pro Bono Law, Palo Alto, CA, argued for plaintiff-appellee.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., DEBORAH A. BYNUM; SHERRY KINLAND KASWELL, EDWARD T. KEABLE, HILARY C. TOMPKINS, JAMES L. WEINER, Office of the Solicitor, United States Department of the Interior, Washington, DC.

---

Before PROST, *Chief Judge,* WALLACH and STOLL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* WALLACH.

Dissenting opinion filed by *Circuit Judge* STOLL.

WALLACH, *Circuit Judge.*

Appellant United States ("Government") appeals the decision of the United States Court of Federal Claims ("Claims Court") finding that it possessed subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b)(1) (2012), to resolve the instant action filed by Jay Hymas, doing business as Dosmen Farms. *Hymas v. United States*, 117 Fed. Cl. 466, 486–88 (2014). The Government also contests the Claims Court's collateral finding that the United States Department of the Interior's Fish and Wildlife Service ("the Service") violated various federal procurement laws and the Administrative Procedure Act ("the APA") when it entered into cooperative farming agreements ("CFAs") with individual farmers to grow crops on public lands in the Umatilla National Wildlife Refuge ("Umatilla Refuge") and the McNary National Wildlife Refuge ("McNary Refuge"). *Id.* at 500–506. We vacate the Claims Court's decision and remand with instructions to dismiss Mr. Hymas's case.

BACKGROUND

Beginning in the 1970s, the Service entered into CFAs with farmers to manage public lands in the National Wildlife Refuge System for the conservation of migratory birds and wildlife, including at the Umatilla and McNary Refuges in the Pacific Northwest.[1]  *See id.* at 469–70.

---

[1]  The Umatilla Refuge covers more than 22,000 acres "within the upper reach of Lake Umatilla in Benton County, Washington and Morrow County, Oregon," and "was established to mitigate for the loss of wildlife habitat

Most CFAs share identical terms, through which the Service permits a "cooperator" to farm specific parcels of public land with specific crops that benefit the wildlife. *See* J.A. 173–203, 212–27 (reproducing several CFAs). No payment occurs for the performance of the CFAs; instead, cooperators typically retain 75 percent of the crop yield for their efforts. The remaining 25 percent is left to feed migratory birds and other wildlife. The Service continues its involvement once cooperators begin to perform the CFAs, advising on decisions related to (1) crop selection; (2) farming methods; (3) pesticide and fertilizer use; and (4) crop harvest.

In the 1990s, the Service issued cropland management plans for the Umatilla and McNary Refuges. The plans call for "Tenure Arrangements" through which "[c]ooperators are selected in accordance with Refuge manual guidelines . . . and are issued a three year [CFA]." J.A. 81. "[CFAs] were normally intended to be multi-year agreements" because the Service determined that "[c]ooperators should be given a long-term interest in the

---

caused by the development of the John Day Lock and Dam and the subsequent flooding to create Lake Umatilla." J.A. 90. It serves as "an important migration and wintering area for waterfowl and other birds in the Columbia River Basin." J.A. 90. The McNary Refuge covers more than 15,000 acres "near the confluence of the Columbia and Snake Rivers in southeastern Washington" and "was established as mitigation for the wildlife habitat losses caused by the flooding of the Columbia River corridor with the completion of the McNary Dam." J.A. 73; *see also* J.A. 133–34. Originally established "as a nesting area for the Great Basin Canada Goose," it has become "more important as a wintering area for the large numbers of mallards and other subspecies of Canada geese . . . ." J.A. 73.

stewardship of the soil." J.A. 15 (internal quotation marks and citation omitted).

Mr. Hymas, through his business Dosmen Farms, sought to secure a CFA with the Service in 2013 and 2014. J.A. 165–72, 208–09. A resident of Kennewick, Washington, Mr. Hymas lived "approximately 7 miles as the crow flies" from the McNary Refuge and 23 miles from the Umatilla Refuge. J.A. 209. When Mr. Hymas expressed his interest in a CFA to the Service, he "indicated that he had not participated in a National Wildlife Refuge Cooperative Farming Program, nor was he a former landowner or tenant of acquired lands." J.A. 209. According to the Service, Mr. Hymas "also indicated that he farmed the local vicinity but did not provide any location information to verify these activities." J.A. 209.

The Service considered Mr. Hymas, but ultimately selected other cooperators. In 2013, the Service awarded four CFAs with one-year terms and two CFAs with multi-year terms. *See* J.A. 173, 178, 183, 188 (CFAs with one-year term); J.A. 193, 198 (CFAs with multi-year terms). In 2014, the Service awarded four CFAs with multi-year terms that covered the same parcels of land subject to the expired CFAs awarded in 2013. J.A. 212–27. The Service did not use formal procurement procedures or solicit full and open competition before it awarded the 2013 and 2014 CFAs; rather, it relied upon its priority selection system that gave preference to previous cooperators with a successful record of farming designated areas within the refuge. J.A. 165–72 (2013 selection decision memos); J.A. 204–11 (2014 selection decision memos). Because Mr. Hymas did not live adjacent to the refuges and had not previously farmed refuge lands, the Service did not select him for a CFA. J.A. 209; *see also* J.A. 167, 169–70 (citing other reasons).

Mr. Hymas filed a bid protest in the Claims Court in April 2013, alleging that the Service violated various

federal procurement laws and the APA by not soliciting "full and open" competition for the CFAs. *Hymas*, 117 Fed. Cl. at 489–93. Mr. Hymas's Amended Complaint alleges that

> the Service's use of a non-competitive bidding process for the [CFAs] violated the [Competition in Contract Act ("the CICA")], 41 U.S.C. § 253(a) (now [41 U.S.C.] § 3301(a)) (Count I); the [Federal Grant and Cooperative Agreement Act ("the FGCAA")], 31 U.S.C. §§ 6303 and 6305 (Count II); and was arbitrary, capricious, an abuse of discretion, and contrary to law [under the APA] (Count III).

*Id.* at 482. Mr. Hymas filed a Motion for Judgment on the Administrative Record, and the Government filed a Motion to Dismiss for lack of subject matter jurisdiction and a Cross-Motion for Judgment upon the Administrative Record. *Id.*

In July 2014, the Claims Court denied the Government's motion to dismiss, finding that it had subject matter jurisdiction over Mr. Hymas's claims. *Id.* at 488–89. The Claims Court held that the CICA, rather than the FGCAA, contains the operative definition of "procurement" for purposes of determining jurisdiction under the Tucker Act. *Id.* at 487. The Claims Court applied the CICA definition to the facts of the case and held that, because the Service used the CFAs at issue "to obtain the services of farmer-cooperators to feed migratory birds and wildlife on the Refuges," that activity amounted to "a procurement," such that it had Tucker Act jurisdiction to entertain Mr. Hymas's challenge. *Id.* at 486.

Turning to the merits, the Claims Court determined that the Service violated the CICA by not using formal procurement procedures to obtain full and open competition. *Id.* at 496. The Claims Court found that neither the Fish and Wildlife Coordination Act of 1958 ("the 1958

Act"), Pub. L. No. 85-624, 72 Stat. 563 (1958) (codified as amended at 16 U.S.C. §§ 661–664 (2012)), nor the National Wildlife Refuge System Administration Act, Pub. L. No. 89-669, 80 Stat. 926 (1966) (codified as amended at 16 U.S.C. § 668dd(h)) ("the 1966 Act"), nor the National Wildlife Refuge System Volunteer and Community Partnership Enhancement Act of 1998, Pub. L. No. 105-242, 112 Stat. 1574 (1998) (codified as amended at 16 U.S.C. §§ 742a, 742f) ("the 1998 Act") authorize the Service to enter into cooperative agreements like the CFAs or exempt the Service from complying with the CICA. *Id.* at 498–500. It also held that the Service's priority selection system violated the FGCAA. *Id.* at 500. Consequently, the Claims Court permanently enjoined the Service "from entering into any [CFAs] or other contractual vehicles concerning the McNary and Umatilla National Wildlife Refuges for the 2015 farming season or thereafter, unless and until the selection process and award[s] comply with the CICA, FGCAA, and the APA." *Id.* at 508. It also ordered the Service to "terminate" the six multi-year CFAs awarded in 2013 and 2014 "at the conclusion of the 2014 farming season." *Id.* at 509. The Claims Court entered judgment accordingly. J.A. 7.

The Government timely appealed that judgment. We have subject matter jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012).

DISCUSSION

I. Standard of Review

"[A] federal court [must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *see Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction, the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing

the cause."). A decision from the Claims Court on the scope of its jurisdiction presents a question of law that we review without deference. *See SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1412 (Fed. Cir. 2014). The party seeking to invoke the Claims Court's jurisdiction must establish that jurisdiction exists by a preponderance of the evidence. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002). "[W]e review the [Claims Court's] findings of fact relating to jurisdictional issues for clear error." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed. Cir. 2006). Although, for purposes of jurisdiction, we typically assume as true all facts alleged in a complaint, where "the factual basis for the court's subject matter jurisdiction" is challenged, "only uncontroverted factual allegations are accepted as true." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993).

## II. The Claims Court Lacked Subject Matter Jurisdiction

"[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Consistent with this principle, the Tucker Act confers limited jurisdiction on the Claims Court to adjudicate claims against the United States. *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997). In relevant part, the Tucker Act states that the Claims Court may render judgment

> on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491(b)(1) (emphasis added). Commonly known as "bid protest jurisdiction," this court has found that this provision speaks "*exclusively*" to "procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010) (emphasis added); *see id.* at 1242–45 (discussing the statutory text and legislative history of § 1491(b)).

As is occasionally necessary in deciding the parameters of bid protest jurisdiction, we must answer certain foundational questions that necessarily will impart whether the court has jurisdiction over the issues raised. *See, e.g.*, *Mudge v. United States*, 308 F.3d 1220, 1224 (Fed. Cir. 2002) (reviewing underlying statutory issues to determine whether the Claims Court properly dismissed suit); *see also In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1361 (Fed. Cir. 2014) (same). Specifically, we must first decide whether the Service has statutory authority to enter into cooperative agreements. If it does not, then the Service could only have negotiated procurement contracts subject to Tucker Act review. If it did have the authority, we must next decide whether the Service properly construed the CFAs as cooperative agreements, rather than procurement contracts. If we find that the Service correctly concluded that the CFAs are not procurement contracts, then we must resolve whether the Claims Court's subject matter jurisdiction under the Tucker Act extends to cooperative agreements. We address each question in turn.

## A. The Service Properly Interpreted the Relevant Statutes to Authorize the use of CFAs

We first must address whether the Service properly interpreted the relevant statutes as authorizing it to negotiate cooperative agreements of the type represented by the CFAs. We review an agency's statutory interpretation using the two-pronged framework established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Coun-*

*cil, Inc.*, 467 U.S. 837 (1984). The first prong requires the court to assess "whether Congress has directly spoken to the precise question at issue"; if so, we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute does not answer the specific question, meaning that it is "silent or ambiguous," then the court must discern "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *Wilder v. Merit Sys. Prot. Bd.*, 675 F.3d 1319, 1322 (Fed. Cir. 2012). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843–44. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844 (footnote omitted).

The Claims Court held that the 1958, 1966, and 1998 Acts do not exempt the CFAs from what the CICA demands. *Hymas*, 117 Fed. Cl. at 498–500. The Government argues that the Claims Court failed to defer to the Service's permissible interpretation of these statutes as allowing the Service to enter into CFAs with individuals who are not volunteers. Appellant's Br. 42–48. We agree with the Government.

1. The Service Permissibly Construed the 1958 Act

In 1934, Congress passed An Act to Promote the Conservation of Wild Life, Fish, and Game, and for other Purposes, which authorized the Service "to provide expert assistance to and to cooperate with Federal, State, and other agencies in . . . increasing the supply of game and fur-bearing animals and fish, in combating diseases, and in developing a Nation-wide program of wild-life conser-

vation and rehabilitation."[2]   Pub. L. No. 73-121, § 1, 48 Stat. 401, 401 (1934) ("the 1934 Act").  Congress amended the 1934 Act in 1946 to authorize the Service "to provide assistance to, and cooperate with, Federal, State, and *public or private agencies and organizations*" in fulfilling its previously-articulated goals and to carry out "other measures necessary to effectuate the purposes of this Act."  An Act to Promote the Conservation of Wildlife, Fish, and Game, and for Other Purposes, Pub. L. No. 79-732, § 1, 60 Stat. 1080, 1080 (1946) ("the 1946 Act") (emphasis added).  Importantly, Congress also required that areas made available to the Service "shall be administered" either "directly," or pursuant to "*cooperative agreements* entered into pursuant to the provisions of section 1."  *Id.* § 4, 60 Stat. at 1081 (emphasis added).  The amendment also expressly authorized the Service to promulgate "rules and regulations for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon."  *Id.*  In 1958, Congress again amended the 1934 Act.  1958 Act, §§ 1, 4, 72 Stat. at 563, 567.  In so doing, it re-enacted the provisions above in substantially identical form.  *Id.*  These provisions remain unchanged.

Because Congress did not define the phrase "public or private agencies and organizations" in the 1946 Act, the Service invoked the express rulemaking authority of that

---

[2]    In 1939, President Roosevelt transferred two bureaus operating within the United States Departments of Agriculture and Commerce, respectively, to the United States Department of the Interior and in 1940 consolidated them into what later became known as the "Fish and Wildlife Service."  *See Reorganization Plan No. III*, 54 Stat. 1231, 1232 (1940) (effective June 30, 1940) (consolidated, renamed); *Reorganization Plan No. II*, 53 Stat. 1431, 1433 (1939) (effective July 1, 1939) (transferred).

Act in 1960, promulgating a regulation allowing the Service to enter into cooperative agreements on a refuge with any "person":

> *Cooperative agreements* with *persons* for crop cultivation, haying, grazing, or the harvest of vegetative products, including plantlife, growing with or without cultivation on wildlife refuge areas may be executed on a share-in-kind basis when such agreements are in aid of or benefit to the wildlife management of the area.

*Title 50—Wildlife: Revision and Reorganization of Title*, 25 Fed. Reg. 8,397, 8,413 (Dep't of Interior Sept. 1, 1960) ("*Final Rules*") (emphases added) (codified at 50 C.F.R. § 29.2 (2012)). The Service defines a "person" as "an individual, club, association, partnership, corporation, or private or public body." *Id.* at 8,398 (codified at 50 C.F.R. § 1.6). These regulations remain unchanged.

The Claims Court rejected the Government's argument that, by authorizing the use of "cooperative agreements" rather than "procurement contracts," the 1958 Act (which, in amending the 1934 Act, retained the "cooperative agreement" provision of the 1946 Act) exempts the Service's CFAs from the competitive bid requirements of the CICA. Enacted in 1984, the CICA established a general requirement that executive agencies "obtain full and open competition through the use of competitive procedures" when "conducting a procurement for property or services." Pub. L. No. 98-369, § 2711, 98 Stat. 494, 1175 (1984). The CICA originally did not include a definition of "procurement," but in 2011 Congress amended the act to define the term. An Act to Enact Certain Laws Relating to Public Contracts as Title 41, United States Code, "Public Contracts," Pub. L. No. 111-350, sec. 3, 41 U.S.C. § 111, 124 Stat. 3677, 3681 (2011). The CICA now defines "procurement" as "all stages of the process of acquiring property or services, beginning with the process

for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111.

As an initial matter, the Claims Court found that the 1958 Act could not have preempted the CICA because Congress passed the CICA in 1984, twenty-six years after the 1958 Act. *Hymas*, 117 Fed. Cl. at 498. The Claims Court reached the same conclusion with respect to the 1966 Act, *id.* at 499, which provided that the Service's regulations "shall continue in effect until modified or rescinded," 1966 Act, § 4(g), 80 Stat. at 929. And it similarly found that the 1960 regulation, codified at 50 C.F.R. § 29.2, could not preempt the 1984 CICA. *Hymas*, 117 Fed. Cl. at 501.

The Claims Court's holdings resolve a non-existent conflict. No provision in the CICA's text indicates that Congress meant to replace the "cooperative agreements" provision of the earlier enacted legislation or the 1960 regulation. §§ 2711–2753, 98 Stat. at 1175–1203. In addition, when Congress amended the CICA in 2011, it intended to complement and clarify its earlier enactments on the same subject matter by providing a definition for "procurement." *See* § 2(b), 124 Stat. at 3677 (explaining that "[i]n the codification of laws by this Act, the intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections"). And nothing in the legislative history accompanying the CICA and the 2011 amendment warrants a different conclusion. *See generally* H.R. Rep. No. 111-42 (2009), *reprinted in* 2010 U.S.C.C.A.N. 1468; H.R. Rep. No. 98-861 (1984) (Conf. Rep.), *reprinted in* 1984 U.S.C.C.A.N. 1445. In the absence of any indication to the contrary in the statute or the legislative history, the Claims Court erred in holding the competitive bidding requirements of the CICA apply to the "cooperative agreements" authorized by regulation pursuant to the 1946 and 1958 Acts. *See, e.g., United*

*States v. Fausto*, 484 U.S. 439, 453 (1988) ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change.").

Turning to the 1958 Act's text, the Claims Court found that it did not provide the Service with the authority to enter into the CFAs because the 1958 Act governs only "[cooperative] agreements between the Service and other 'Federal, State, and *public or private agencies and organizations*' to coordinate conservation between these various organizations." *Hymas*, 117 Fed. Cl. at 498 (emphasis added) (quoting 16 U.S.C. § 661). Because the CFAs at issue were between the Service and "private farmers," rather "public or private agencies" or "organizations," the Claims Court found the 1958 Act inapplicable. *Hymas*, 117 Fed. Cl. at 498. It also determined that the phrase "public or private [agencies and] organizations" unambiguously "describes the types of governmental and private entities that need to coordinate to conserve wildlife" and that it "has nothing to do with cooperative farming agreements between the Service and private farmers." *Id.* at 501. It also reasoned that coordination with private farmers does not "make sense within the context of the statute." *Id.* at 502. As a result, the Claims Court determined that the statute contained no gap that 50 C.F.R. § 29.2 could fill. *Id.*

We find ambiguity in the 1958 Act's reference to "public or private agencies and organizations" where the Claims Court did not; its construction cannot stand. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("[P]rior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."). The statute does not define the phrase "public or private agencies and organizations," so we give the terms "their ordinary, established meaning,

for which we may consult dictionaries." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1320 (Fed. Cir. 2003). The definition of "private" includes "belonging to or concerning an individual, person, company, or interest." *Private*, Webster's Third New International Dictionary of the English Language Unabridged (1986) ("Webster's"). "Organization" involves an "administrative and functional structure of an organization" such "as a business." *Organization*, *id.* A business reflects a "commercial enterprise carried on for profit" and encompasses, among other structures, a "sole proprietorship" like Mr. Hymas's Dosmen Farms. *Business*, Black's Law Dictionary (8th ed. 2004) ("Black's Law Dictionary"); *see id.* (defining "sole proprietorship" as a "business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity"); *see also Hymas v. United States*, No. 2014-5150, Docket No. 5 at 1 (where Mr. Hymas answered "none" as to whether any parent corporation or publicly held companies own ten percent or more of Dosmen Farms). These terms also have alternative definitions and conceivably could cover other entities. *Private*, Webster's; *Organization*, *id.*; *see also Business Enterprises*, Black's Law Dictionary (describing different business structures). "The existence of alternative dictionary definitions of a term . . . indicates that the statute is open to interpretation." *Info. Tech.*, 316 F.3d at 1320–21 (internal quotation marks, brackets, and citation omitted). Taken together, we find that the phrase "public or private agencies and organizations" contains ambiguity.

Pursuant to Congress's express delegation in the 1958 Act, codified at 16 U.S.C. § 664, the Service promulgated 50 C.F.R. § 29.2 in 1960 through notice-and-comment rulemaking. The regulation explains that the Service may enter into cooperative agreements with any "person," 50 C.F.R. § 29.2, which includes "an individual, club, association, partnership, corporation, or private or public

body," 50 C.F.R. § 1.6. The Service's decision to select the term "person" to interpret the ambiguous phrase "public or private agencies and organizations" in 16 U.S.C. § 661 reflects a permissible construction based upon a relevant dictionary definition. *See Info. Tech.*, 316 F.3d at 1321 ("[W]e must defer to a properly promulgated regulation[] if it is 'based on a permissible construction of the statute.'" (quoting *Chevron*, 467 U.S. at 843)). That Congress has taken no action over the past fifty years to disturb the Service's interpretation offers further support for our conclusion. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978) (affording "great deference" to the agency's interpretation that the agency maintained for more than eighty years); *see also Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 983 (1986) ("[A] congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (internal quotation marks and citation omitted)).

The Claims Court's holdings do not support a different result. First, the Claims Court concluded that coordination between the Service and private farmers "make[s] [no] sense within the context of the statute," *Hymas*, 117 Fed. Cl. at 502, but that *ipse dixit* statement does not answer *why* the Service could not coordinate conservation efforts with private farmers consistent with the 1958 Act's goals, just as it had for the past fifty years. Second, it observed that 50 C.F.R. § 29.2 did not expressly state that the Service promulgated the regulation to interpret the phrase "public or private agencies and organizations" first set forth in section 1 of the 1946 Act (codified at 16 U.S.C. § 661), *Hymas*, 117 Fed. Cl. at 502; that finding overlooks the Service's citation in its rulemaking notice of 16 U.S.C. § 664, which in 1960 provided for "cooperative agreements entered into pursuant to the provisions of [16 U.S.C. § 661]." 16 U.S.C. § 664 (1958); s*ee Final Rules*, 25 Fed. Reg. at 8,413. Third, the Claims Court relied upon the

principle of *ejusdem generis* to find the phrase "public or private agencies and organizations" unambiguous,[3] *Hymas*, 117 Fed. Cl. at 502, but that canon "comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute," *Turkette*, 452 U.S. at 581, which the Claims Court did not find. In any event, the Claims Court should have deferred to the Service's regulation that permissibly construed the ambiguous statute. Finally, that a different Service regulation also contains the term "cooperative agreement" does not diminish the reasonableness of 50 C.F.R. § 29.2, and the Claims Court erred in concluding otherwise. *Hymas*, 117 Fed. Cl. at 502. Instead, it confirms that the Service broadly interpreted its cooperative agreement authority to encompass both the public and private spheres. *See* 50 C.F.R. § 25.12(a) (using "cooperative agreement" in the definition of "coordination area").

In sum, the Service permissibly construed the 1958 Act in filling a statutory gap and properly found that the Act authorized it to negotiate cooperative agreements. As we explain in the next subsection, a separate statutory scheme—the Fish and Wildlife Act of 1956, Pub. L. No. 84-1024, 70 Stat. 1120 (1956) ("FWA")—also permits the Service to negotiate cooperative agreements.

2. The Claims Court's Construction Conflicts with the 1998 Act's Unambiguous Terms and Legislative History

After it initially enacted the FWA in 1956 to rename the Service, Congress amended the FWA in 1998 in part to promote volunteer programs and community partner-

---

[3]    The canon of *ejusdem generis* teaches "that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." *United States v. Turkette*, 452 U.S. 576, 581 (1981).

ships for the benefit of National Wildlife Refuges. 1998 Act, 112 Stat. 1574. Pursuant to that amendment, Congress authorized the Service to "enter into [] cooperative agreement[s] . . . with any partner organization, academic institution, or State or local government agency to carry out 1 or more projects or programs for a refuge." *Id.* at sec. 5, 16 U.S.C. § 742f(d)(2)(A), 112 Stat. at 1576. In 2004, Congress "clarif[ied] . . . [the Service's] cooperative agreement authority," providing that

> the Secretary of the Interior may negotiate and enter into a cooperative agreement with a partner organization, academic institution, State or local government agency, *or other person* to implement one or more *projects or programs for a refuge or complex of geographically related refuges in accordance with the purposes of this subsection* and in compliance with the policies of other relevant authorities, regulations, and policy guidance.

National Wildlife Refuge Volunteer Act of 2004, Pub. L. No. 108-327, sec. 4, § 742f(d)(2)(A), 118 Stat. 1271, 1272 (2004) ("2004 Amendments") (capitalization altered) (emphases added). "[P]rojects or programs" may include efforts to (1) "promote the stewardship of resources of the refuge through habitat maintenance, restoration, and improvement, biological monitoring, or research"; and (2) "support the operation and maintenance of the refuge through constructing, operating, maintaining, or improving the facilities and services of the refuge[.]" 1998 Act, sec. 5, § 742f(d)(2)(B), 112 Stat. at 1576. These provisions remain unchanged.

The Claims Court found that neither the 1998 Act nor the 2004 Amendments provide the Service with the authority to negotiate cooperative agreements like the CFAs. It found the 1998 Act's text focuses on "'voluntary programs or community partnerships,'" not "contractual arrangements whereby farmer-cooperators use public

land to grow crops." *Hymas*, 117 Fed. Cl. at 499 (quoting 1998 Act, 112 Stat. at 1574). It examined the legislative history of the 2004 Amendments and determined that Congress intended the 1998 Act and 2004 Amendments to expand the Service's authority to hire more volunteers, not its authority to negotiate cooperative agreements under which cooperators receive compensation in kind. *Hymas*, 117 Fed. Cl. at 499–500 (examining S. Rep. No. 108-315, at 3 (2004); H.R. Rep. No. 108-385 (2003), *reprinted in* 2004 U.S.C.C.A.N. 1163, 1165–66). It also observed that the CFAs "could be considered projects and programs to 'promote the stewardship of resources of the refuge,'" but declined to adopt such a broad interpretation of the 1998 Act because doing so would mean there was no "meaningful limitation on the types of agreements that the Service could enter into, pursuant to section 742f(d)." *Id.* at 500 & n.35. Finally, the Claims Court concluded that Congress "could have exempted the Service from the CICA" when it enacted the 2004 Amendments, "but did not do so." *Id.* at 500.

The Claims Court's interpretation conflicts with the 1998 Act's plain text. First, the Claims Court incorrectly construed the 1998 Act's preamble to concern volunteer activities only. To the contrary, Congress enacted the 1998 Act to promote volunteer programs "and for other purposes." 1998 Act, 112 Stat. at 1574. In any event, a preamble cannot overcome the statute's plain language. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008) ("[I]n America the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." (internal quotation marks and citation omitted)). The statute unambiguously permits the Service to "negotiate and enter into a cooperative agreement" like the CFA with a "person" to implement a "program[]" that (1) "promote[s] the stewardship of resources of the refuge[s] through habitat maintenance,

restoration, and improvement"; or (2) "support[s] the operation and maintenance of the refuge through constructing, operating, maintaining, or improving the facilities of the refuge[s]." 16 U.S.C. § 742f(d)(2)(A), (B)(i)–(ii); *see* J.A. 173–203, 212–27 (discussing purposes of the CFAs).

The Claims Court's reading of the legislative history is similarly problematic. When it passed the 1998 Act, Congress identified three broad purposes that included, among other goals, the facilitation of "partnerships between the [National Wildlife Refuge System] and non-Federal entities to promote public awareness of the resources of the System and public participation in the conservation of those resources" and the encouragement of "donations and other contributions by persons and organizations to the System." 1998 Act, sec. 2(b), 112 Stat. at 1574; *cf. id.* (explicitly identifying volunteer activities as a separate goal). That Congress later sought to enhance volunteer participation in 2004 does not mean that it did so at the expense of its earlier goals. *See Aectra Refining & Mktg., Inc. v. United States*, 565 F.3d 1364, 1370 (Fed. Cir. 2009) ("Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts."); *see also Fausto*, 484 U.S. at 453 ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change.").

With respect to the Claims Court's concerns about meaningful limitations to the Service's cooperative agreements authority, we find that exercise best left to the Service. We have held that "[o]ur duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." *Suramerica de Aleaciones*

*Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992). We decline to chart a different course today.

Finally, the Claims Court's assertion that Congress could have exempted the Service from the CICA in 2004 (but did not) proffers a false choice. The Service has the authority to negotiate cooperative agreements like the CFAs should it choose to do so. We have held that such agreements need not comply with the CICA in analogous circumstances. *See CMS Contract Mgmt. Servs. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1381 (Fed. Cir. 2014) (holding that "agencies escape the requirements of federal procurement law" under the CICA when "using a cooperative agreement").

Taken together, the 1958 and 1998 Acts, as amended, are independent sources that authorize the Service to negotiate cooperative agreements like the CFAs. The Claims Court erred in holding otherwise.

## B. The Service Properly Construed the CFAs as Cooperative Agreements

Having determined that the statutory scheme permits the Service to enter into cooperative agreements, we next must answer whether the Service properly construed the CFAs at issue as "cooperative agreements," rather than "procurement contracts." "Whether a contract is a procurement contract or a cooperative agreement is a question of law," which the court reviews de novo. *Id.* at 1385 (citing *Maint. Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984)). As we explain below, the Service properly construed the instruments at issue as cooperative agreements.

Various statutes address legal instruments under federal law. "Statutory interpretation begins with the language of the statute." *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000)). "A court

derives the plain meaning of the statute from its text and structure." *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). "If the words are unambiguous, no further inquiry is usually required." *Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771, 773 (Fed. Cir. 1999) (citation omitted); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). In defining the plain meaning of a statute, courts must avoid "add[ing] conditions" to the applicability of a statute that do not appear in the provision's text. *Norfolk Dredging Co.*, 375 F.3d at 1111.

As previously observed, the Claims Court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1) speaks *"exclusively"* to "procurement solicitations and contracts." *Res. Conservation*, 597 F.3d at 1245 (emphasis added). Because the Tucker Act does not define the term "procurement" in 28 U.S.C. § 1491(b)(1), *see id.* at 1242–45, the court has relied upon the definition of "procurement" in 41 U.S.C. § 111 "to determine whether a 'procurement' has occurred pursuant to § 1491(b)." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citation omitted);[4] *see also* 41 U.S.C. § 111 (defining "procurement" to cover "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout").

---

[4] When Congress amended the CICA and reorganized Title 41 of the United States Code in 2011, it moved the definition of "procurement" from 41 U.S.C. § 403(2) to § 111. Sec. 3, § 111, 124 Stat. at 3681. *Distributed Solutions* cites to the definition under § 403(2). 539 F.3d at 1345.

The definition of "procurement" in 41 U.S.C. § 111 is not the only provision relevant to our inquiry, nor does a "procurement contract" encompass the entire universe of instruments at executive agencies' disposal. In 1978, Congress passed the FGCAA in light of its findings that there was "a need to distinguish [f]ederal assistance relationships from [f]ederal procurement relationships," as well as "uncertainty as to the meaning of . . . 'cooperative agreement.'" FGCAA, sec. 2, 92 Stat. at 3. In its current form, the FGCAA "prescribe[s] criteria for executive agencies in selecting appropriate legal instruments to achieve (A) uniformity in their use by executive agencies; (B) a clear definition of the relationships they reflect; and (C) a better understanding of the responsibilities of the parties to them." 31 U.S.C. § 6301(2). Congress intends the FGCAA to "eliminate unnecessary administrative requirements on recipients of Government awards by characterizing the relationship between executive agencies and contractors, States, local governments, and other recipients in acquiring property and services and in providing United States Government assistance." *Id.* § 6301(1). To promote these goals, Congress distinguished "procurement contract[s]" from "cooperative agreements" in the FGCAA. *Id.* §§ 6303 (explaining when executive agencies "shall use" procurement contracts), 6305 (explaining when executive agencies "shall use" cooperative agreements).[5]

---

[5] The dissent states that "the FGCAA does not grant the agencies flexibility in determining when to use a particular instrument in government contracting" because 31 U.S.C. § 6303 articulates the circumstances under which an agency "shall" use a procurement contract. Dissent at 5–6. Congress's use of "shall" in § 6303 is not dispositive. The dissent overlooks Congress's other directives as to when an agency "shall" use grants and

In particular, the FGCAA requires that "[a]n executive agency shall use a procurement contract" when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." *Id.* § 6303. By contrast, "[a]n executive agency shall use a cooperative agreement" when (1) "the principal purpose of the relationship is to transfer a thing of value" to the recipient "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease or barter) property or services for the direct benefit or use of the United States Government" and (2) "substantial involvement" is "expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." *Id.* § 6305.

Pursuant to the authority delegated by Congress, *see id.* § 6307, the Office of Management and Budget has explained that "determinations of whether a program is principally one of procurement or assistance, and whether substantial Federal involvement in performance will normally occur[,] are basic agency policy decisions" and that "Congress intended the [FGCAA] to allow agencies flexibility to select the instrument that best suits each transaction." *Implementation of Federal Grant and Cooperative Agreement Act of 1977*, 43 Fed. Reg. 36,860, 36,863 (Office of Mgmt. and Budget Aug. 18, 1978). Congress amended the FGCAA in 1982 without substantive change, An Act to amend the Federal Grant and Cooperative Agreement Act, Pub. L. No. 97-162, 96 Stat. 23 (1982), and its provisions remain unchanged.

1. The Claims Court's Decision Misinterprets the Law

---

cooperative agreements. 31 U.S.C. §§ 6304 (grants), 6305 (cooperative agreements).

The Claims Court determined that the CFAs consti-
tuted procurement contracts because in its view the
Service uses them "to obtain the services of farmer-
cooperators to feed migratory birds and wildlife on the
Refuges," which in its "judgment . . . is a procurement."
*Hymas*, 117 Fed. Cl. at 486 (citing 41 U.S.C. § 111; *Dis-
tributed Sols.*, 539 F.3d at 1345; *Res. Conservation*, 597
F.3d at 1244; *RAMCOR Servs. Grp., Inc. v. United States*,
185 F.3d 1286, 1289 (Fed. Cir. 1999)). The Claims Court
also determined that this court's decision in *CMS* sup-
ported its conclusion, finding that in *CMS*

> the agreements were used to obtain services from
> third-parties, not to provide assistance to them.
> In this case, the intended beneficiaries are the
> migratory birds and wildlife on the refuges. The
> farmer-cooperators are intermediaries. The Ad-
> ministrative Record demonstrates that the Service
> contracted with farmer-cooperators, not to benefit
> them financially, but to obtain their services to
> provide food for migratory birds and wildlife, in
> exchange for the farmers' personal use of public-
> owned lands. The fact that farmer-cooperators
> may profit from this arrangement does not change
> their status as intermediaries. As such, the coop-
> erative farming agreements in this case are pro-
> curements, subject to the Tucker Act.

*Id.* at 487 (footnote and citations omitted). It concluded
by observing that 50 C.F.R. § 29.2 could not exempt the
CFAs from its Tucker Act jurisdiction because "numerous
circuit courts . . . have found uniformly that no *Chevron*
deference is given because the task of determining a
federal court's jurisdiction falls to the court, not an agen-
cy." *Id.* at 488 (brackets, internal quotation marks, and
citation omitted).

The Claims Court's holdings and Mr. Hymas's argu-
ments rest in large part upon the faulty premise that the

definition of "cooperative agreement" in the FGCAA is irrelevant and that 41 U.S.C. § 111 contains the only definition that courts may consult to determine (1) whether a particular transaction constitutes a procurement and, consequently, (2) whether the Claims Court has bid protest jurisdiction over a particular claim. *See Hymas*, 117 Fed. Cl. at 486–88; Appellee's Br. 29–32, 47–48. Put another way, the Claims Court and Mr. Hymas would have us look to 41 U.S.C. § 111 as the sole source containing the relevant definitions of "procurement" *and* "cooperative agreement." The statute's text does not support that result, given that it speaks to "procurement" only.

What is more, the court did not hold in *Distributed Solutions* or in *CMS* that courts must construe instruments pursuant to 41 U.S.C. § 111 without regard to other relevant statutes.[6] To have done so would impose an additional condition not present in the statute's text, *see Norfolk Dredging Co.*, 375 F.3d at 1111, as well as offend the well-established canon that courts should avoid constructions that would render statutory text "superfluous." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991); *see also Conn. Nat'l Bank*, 503 U.S. at 253 (explaining that overlapping statutes may be given effect so long as there is no "positive repugnancy" between them). *But see 360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 586–87 (2012) (relying solely upon 41 U.S.C. § 111 and declining to consider the FGCAA to

---

[6] Counsel for both parties acknowledged at oral argument that no authority supports the proposition that 41 U.S.C. § 111 is the only dispositive source for our inquiry. Oral Argument at 17:53–18:15 (Counsel for Mr. Hymas), 29:48–30:26 (Counsel for the Government), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2014-5150.mp3.

determine jurisdiction). It also would mean that Congress *sub silentio* imposed such a condition upon the courts, effectively hiding an "elephant[] in [a] mousehole[]." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Our case law counsels against such a narrow approach. For example, the court in *CMS* considered definitions in the FGCAA in determining that the instrument in question was a procurement contract, rather than a cooperative agreement. 745 F.3d at 1381, 1386. Thus, because we must respect the concinnity between the separate yet interrelated statutes that Congress has enacted, we decline to rely solely upon 41 U.S.C. § 111 for our inquiry. *See, e.g.*, *Conn. Nat'l Bank*, 503 U.S. at 253.

The Claims Court's construction also ignores the context in which Congress enacted the definition of "procurement" in 41 U.S.C. § 111. Congress legislated against the backdrop of the 1978 FGCAA when, in 2011, it defined "procurement" in 41 U.S.C. § 111. "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Aectra Refining & Mktg.*, 565 F.3d at 1370. Congress presumably did not intend for the term "procurement" in 41 U.S.C. § 111 to conflict with or otherwise override the definitions provided in the 1978 FGCAA, which it enacted to achieve uniformity and clarity in the area. *See* FGCAA, sec. 2(b)(2), 92 Stat. at 3; *Fausto*, 484 U.S. at 453 ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change.").

With these precepts in mind, we find that the Service properly construed the CFAs as cooperative agreements, rather than procurement contracts. Under the FGCAA, whether an instrument reflects a "procurement contract" or a "cooperative agreement" turns upon the principal purpose of the relationship. If the Service principally

intended to "transfer a thing of value" to the private farmers "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit of or use of the United States Government," then the instrument is a cooperative agreement. 31 U.S.C. § 6305(1). The Service must also remain "substantial[ly] involve[d]" in the activity. *Id.* § 6305(2).

We find that the CFAs meet this definition. First, the Service principally intended the CFAs to transfer a thing of value (i.e., the right to farm specific refuge lands and retain a share of the crop yield) to carry out a public purpose authorized by law (i.e., to conserve wildlife on the refuges). J.A. 173–203, 212–27. Indeed, the 1958 Act provides that the Service "is authorized to provide assistance to, and cooperate with, . . . public or private agencies and organizations in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat." 16 U.S.C. § 661. Likewise, the 1998 Act authorizes the agency to "negotiate and enter into a cooperative agreement with a . . . person to implement one or more projects or programs for a refuge." 16 U.S.C. § 742f(d)(2)(A). Thus, there is no serious dispute that assisting private farmers to promote wildlife conservation is the *sine qua non* of the CFAs. Second, the Service remains substantially involved in the activity, advising on decisions related to crop selection, farming methods, pesticide and fertilizer use, and crop harvest. J.A. 173–203, 212–27.

The CFAs cannot be construed as procurement contracts because the agency did not intend to acquire farming "services" for the "direct benefit or use of the United States Government." 31 U.S.C. § 6305(1); *see* 41 U.S.C. § 111 (defining "procurement" as encompassing "all stages of the process of acquiring property or services"). True, the CFAs indirectly benefit the Service since the private

farmers' activities advance the agency's overall mission, but that is true for nearly all cooperative agreements. More importantly, the Service does not directly benefit from the farming services provided pursuant to the CFAs because (1) it does not receive payment from the farmers pursuant to the agreements, *see* J.A. 79; and (2) "[r]efuge crop shares are all used by wildlife in the field" or retained by the farmers, such that "[t]here are no excess crops for disposition" by the Service, J.A. 82. And as counsel for the Government explained, a traditional procurement would not provide the Service with the flexibility needed to react to exigencies that regularly arise under the cropland management plans on the Umatilla and McNary Refuges, such as decisions regarding what plants to crop, when to harvest them, and how to tend to them. *See* Oral Argument at 11:05–12:31, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 14-5150.mp3; *see also* J.A. 173–203, 212–27 (describing decisions that arise under the plans and the need for flexibility in making them).[7]

Our decision in *CMS* does not, as the Claims Court held, warrant a different conclusion. In *CMS*, we found

---

[7] The dissent states that "the crop management plans' description of cooperative agreements being 'negotiated' and of the farmer receiving a portion of the harvested crops 'in return' for his services strongly suggests a quid pro quo relationship" indicative of "acquisitions" secured through a procurement contract. Dissent at 5. The argument is *ipse dixit*, and in any case, the natural corollary to that argument is that no negotiation or exchange occurs when "the principal purpose of the relationship is to transfer a thing of value" to the recipient "to carry out a public purpose of support or stimulation authorized by a law of the United States." 31 U.S.C. § 6305(1).

that "the proper instrument is a procurement contract" when a federal agency has "created an intermediary relationship with" a third party. 745 F.3d at 1386 (citation omitted). However, the court based that fact-specific determination on its finding that the intermediary did "not receiv[e] assistance from the federal agency," but rather "provide[d] a service to another entity which is eligible for assistance." *Id.* (internal quotation marks and citation omitted). The situation here is quite different. For example, the 1958 Act authorizes the agency to "provide *assistance* to, and cooperate with" private farmers to promote wildlife conservation, 16 U.S.C. § 661 (emphasis added), and the CFAs allow the Service to provide *assistance* to those farmers (in the form of permission to farm on the refuges and various crop management decisions) to promote wildlife conservation. Put another way, the Service did not enter into the CFAs to obtain a service from the farmers, but rather negotiated with them to provide assistance that would further the goals of the 1958 and 1998 Acts.[8]

Congress intended the FGCAA to provide federal agencies with the "flexibility" to determine "whether a given transaction or class of transactions is procurement or assistance and, if assistance, whether the transaction or class of transactions is to be associated with a type of grant or cooperative agreement relationship." S. Rep. No.

---

[8]   The dissent believes that our decision conflicts with *CMS* because, like in *CMS*, "the CFAs here engage third-party farmers merely as intermediaries that help the Service fulfill its mission of feeding migratory birds." Dissent at 5 (citing *CMS*, 745 F.3d at 1386). Here, however, unlike in *CMS*, the Service remains substantially involved in the activity, advising on decisions related to crop selection, farming methods, pesticide and fertilizer use, and crop harvest. J.A. 173–203, 212–27.

95-449, at 10 (1977); *see also id.* (stating that "the mission of the agency will influence the agency's determination" and that "the agency's classification of its transactions will become a public statement for public, recipient, and congressional review of how the agency views its mission, its responsibilities, and its relationships with the non-federal sector").[9] Because Congress did not *require* the use of particular instruments in particular situations, it left a gap for agencies to fill, and the Supreme Court has stated that filling such gaps "involves difficult policy choices that agencies are better equipped to make than courts." *Brand X*, 545 U.S. at 980 (citing *Chevron*, 467 U.S. at 865–86). Courts should exercise caution before determining that any such decisions go beyond the policy making realm that rests within the agency's purview. *See Suramerica de Aleaciones Laminadas*, 966 F.2d at 665. That principle has particular importance in this case, where the Claims Court's judgment (if permitted to stand) would severely undermine the Government's ability to negotiate cooperative agreements under appropriate circumstances, as well as frustrate the Service's attempts to rely upon such agreements to accomplish its statutory goals on over 100 refuges. Oral Argument at 8:00–26 (discussing effect on the Government generally), 10:20–27 (discussing effect on refuges), http://oralarguments.cafc.

---

[9] The dissent takes issue with our citation to legislative history, arguing that § 6303 is unambiguous in its direction that an agency "shall use a procurement contract" when the principal purpose is to acquire services for the direct benefit or use of the United States. Dissent at 6. But we conclude that the CFAs do not have such a principal purpose. Thus, as we explained above, the "shall" language of § 6303—as well as the dissent's complaint about lack of its ambiguity and our reliance on legislative history—is misplaced.

uscourts.gov/default.aspx?fl=2014-5150.mp3.

## C. Cooperative Agreements Are Not Subject to Tucker Act Review

With the foundational questions answered, the court must decide whether the Tucker Act confers jurisdiction on the Claims Court to hear Mr. Hymas's claims. Our jurisprudence explains that the Claims Court's jurisdiction under 28 U.S.C. § 1491(b) "exclusively" concerns "procurement solicitations and contracts," *Res. Conservation*, 597 F.3d at 1245, and that "agencies escape the requirements of federal procurement law" under the CICA when "using a cooperative agreement." *CMS*, 745 F.3d at 1381; *see* 31 U.S.C. §§ 6303, 6305 (distinguishing procurement contracts from cooperative agreements); *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 271 n.1 (4th Cir. 1999) (noting the distinction between "'procurement contracts' and 'cooperative agreements'" under the FGCAA); *accord* S. Rep. No. 95-449, at 11 (1977) (explaining that if an award changes from a procurement contract to a grant, it need not comport with federal procurement law). Thus, because the Service properly construed the CFAs as cooperative agreements, the Claims Court must dismiss Mr. Hymas's action. *Ex parte McCardle*, 74 U.S. at 514 ("Without jurisdiction, the court cannot proceed at all in any cause.").[10]

## CONCLUSION

The remaining arguments are unpersuasive. Accordingly, the court vacates the Claims Court's judgment and remands for disposition consistent with this opinion,

---

[10] Because the Claims Court does not possess jurisdiction over Mr. Hymas's complaint, we need not address its findings that the Service violated various federal procurement laws and the APA when it entered into the CFAs. *See* Appellant's Br. 30–49.

including the dissolution of the permanent injunction and the dismissal of Mr. Hymas's action.

**VACATED AND REMANDED**

Costs

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**JAY HYMAS, d/b/a DOSMEN FARMS,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2014-5150

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00291-SGB, Judge Susan G. Braden.

---

STOLL, *Circuit Judge*, dissenting.

In *CMS Contract Management Services v. Massachusetts Housing Finance Agency*, we emphasized that when the principal purpose of an agreement is to procure services of a third party to help an agency achieve its mission, the proper instrument under the Federal Grant and Cooperative Agreement Act ("FGCAA") is a procurement contract. 745 F.3d 1379 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1842 (2015). The FGCAA instructs that executive agencies "shall use" a procurement contract when the statutory criterion is met, as it was in this case. *See* 31 U.S.C. § 6303. Here, the United States Department of the Interior's Fish and Wildlife Service ("the Service") used cooperative farming agreements ("CFAs") to obtain farming services so that migratory birds, which the Ser-

vice is obligated to protect, would be fed.  The record shows that the Service would have performed this task itself had it not contracted with third-party farmers. Based on this record, the principle purpose of the CFAs was to acquire farming services to feed migratory birds, so the Service was compelled to use a procurement contract, not a cooperative agreement, when entering into the CFAs.  Yet, the majority defers to the Service's decision on whether to use a procurement contract or a cooperative agreement for the CFAs.  Such an approach is incompatible with our decision in *CMS* and departs from the plain language of the statute.  I respectfully dissent.

## I.

We explained in *CMS* that the FGCAA "sets forth the type of legal instrument an executive agency must use when awarding a federal grant or contract."  *CMS*, 745 F.3d at 1381.  Moreover, we indicated in *CMS* that "[w]hether a contract is a procurement contract or a cooperative agreement is a question of law," which we review de novo.  *Id.* at 1385 (citing *Maint. Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984) ("Determination of the type of contract is a matter of law—not controlled by a label in the contract.").  In my view, *CMS* is squarely on point with the facts of this case and controls the outcome.

In *CMS*, we reviewed agreements that the Department of Housing and Urban Development ("HUD") had entered into with local public housing authorities for compliance with the FGCAA.  *CMS*, 745 F.3d at 1381. Those agreements had the local housing authorities administer contract payments with housing project owners rather than HUD, which had traditionally administered such payments.  HUD both provided the local housing authorities with funds for paying the project owners and paid the local housing authorities an operating fee for their services.  HUD characterized the agree-

ments at issue as "cooperative agreements." *CMS*, Joint App'x at AR85.

Responding to protests filed by non-selected local housing authorities, we looked to the primary, or principal, purpose of the agreements, as commanded by the statutory text. *See* 31 U.S.C. §§ 6303, 6305. We held that "the primary purpose of the [HUD agreements] is to procure the services of the [local housing authorities] to support HUD's staff and provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance." *CMS*, 745 F.3d at 1385. Citing the record, we explained that HUD entered into the contracts with local housing authorities so that HUD staff—who would otherwise be responsible for administering payments to project owners—could focus on other tasks. *Id.* We recognized that by providing a service on behalf of HUD, the local housing authorities had formed an intermediary relationship with HUD, and concluded that, "in the case of an intermediary relationship, the proper instrument is a procurement contract." *Id.* at 1386 (internal quotation marks omitted).

Here, the Claims Court determined that the principal purpose of the CFAs was to assist the Service in fulfilling its mission to feed migratory birds:

> In this case, the intended beneficiaries are the migratory birds and wildlife on the refuges. The farmer-cooperators are intermediaries. The Administrative Record demonstrates that the Service contracted with farmer-cooperators, not to benefit them financially, but to obtain their services to provide food for migratory birds and wildlife, in exchange for the farmers' personal use of public-owned lands.

*Hymas v. United States*, 117 Fed. Cl. 466, 487 (2014).

The record confirms the Claims Court's determination.  In administering the National Wildlife Refuge System, the Service has a mission to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System."  16 U.S.C. § 668dd(a)(4)(A).  To fulfill its mission, the Service is required to generate and comply with a comprehensive plan for managing the refuges under its control.  16 U.S.C. § 668dd(e).  The comprehensive plan the Service established for the McNary and Umatilla Refuges indicates that "cropland farming management is a critical Refuge operation in meeting purposes of the Refuge," including purposes such as "waterfowl management."  J.A. 162–63.  Further, the Service's cropland management plans explain that croplands on the Refuges are "primarily managed for the benefit of waterfowl."  J.A. 74, 92.

With that mission in mind, the Service contemplated three alternative options for cropland farming on the Refuges.  Under the first option, the Service staff would produce crops.  Specifically, "all crop production would be conducted by Refuge staff and all costs associated with farming (water, seed, fertilizer, etc.) paid for with Refuge funds."  J.A. 77, 96.  The two other options involved third parties, with the Service contracting with farmers to cultivate the land and provide crops for the birds in exchange for either pay or, as in the CFAs at issue in this case, crops.

The Service's plans go on to describe a CFA as "a *negotiated* agreement between the Refuge and private farmer to produce crops for both parties."  J.A. 79, 98 (emphasis added).  "In return" for bearing the costs of production and "producing a specified amount of crops for the Refuge, the [farmer] is allowed to harvest and sell the remaining crops."  *Id.*  To provide sufficient crops for the farmer to take as his own, CFAs require the Service to cede much more land to farmers than the farm-for-pay option, which shows that the difference between option

two—paying the farmers money in exchange for farming—and option three—paying the farmers share in crops in exchange for farming—is not a meaningful one.

Based on the record before us, the Claims Court did not err in concluding that the principal purpose of the CFAs is to "*acquire (by purchase, lease, or barter)* property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6303 (emphasis added). Similar to the agreements in *CMS*, for which we found that the local housing authorities were "merely used to provide a service to another entity which is eligible for assistance," the CFAs here engage third-party farmers merely as intermediaries that help the Service fulfill its mission of feeding migratory birds. *CMS*, 745 F.3d at 1386. Also as in *CMS*, but for the farmers, the Service would have undertaken the contracted-for service itself. Furthermore, the crop management plans' description of cooperative agreements being "negotiated" and of the farmer receiving a portion of the harvested crops "in return" for his services strongly suggests a quid pro quo relationship. J.A. 79, 98. These facts indicate that the CFAs embodied Service acquisitions, not a transfer of a thing of value as the Service argues.

## II.

Despite the majority's assertions to the contrary, the FGCAA does not grant agencies flexibility in determining when to use a particular instrument in government contracting. Quite the opposite, the statute directs that an executive agency:

> *shall* use a procurement contract as the legal instrument . . . when the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government.

31 U.S.C. § 6303 (emphasis added).

It is well-established that "shall" is ordinarily the language of statutory command; it is not generally permissive or subject to agency interpretation. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see also Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command.") (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)); *Miller v. French*, 530 U.S. 327, 337 (2000) (refusing to interpret the mandatory term "shall" as permissive). It is also true that in construing statutes, "[w]e must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). This clear statutory text belies the majority's conclusion that "Congress did not *require* the use of particular instruments in particular situations." Maj. Op. 30 (emphasis in original).

Another central precept of statutory interpretation warns that when "[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997). With this in mind, the majority's approach of relying on legislative history to discern the FGCAA's intended purpose, rather than applying the statute's unambiguous command, is misguided. But even if the statute were unclear, there would be no need to resort to legislative history because the FGCAA itself states its purpose: to "*prescribe* criteria for executive agencies in selecting appropriate legal instruments." 31 U.S.C. § 6301(2) (emphasis added); *see* BLACK'S LAW DICTIONARY 1373 (10th ed. 2014) (defining "prescribe" as "to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)").

Thus, because the principle purpose of the CFAs aligns with the criterion outlined in 31 U.S.C. § 6305, it is incorrect for the majority to assert that Congress "left a gap for agencies to fill" when determining what legal

instrument to use. Maj. Op. 30. For if "Congress has spoken clearly on the disputed question, then 'that is the end of the matter'" and there is no gap for the Service to fill. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1875 (2013) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, (1984)). Applying that teaching to this case, the Service should not receive deference to its choice of legal instrument for entering into the CFAs with farmers. Because the Claims Court properly concluded that the principal purpose of the CFAs is to "acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," the FGCAA instructs that a procurement contract should be used. 31 U.S.C. § 6303.

## CONCLUSION

Given our interpretive guidance in *CMS* and the plainly worded command of the FGCAA, I would uphold the Claims Court's determination that the CFAs at issue here must be entered into as procurement contracts, giving the Claims Court subject matter jurisdiction under the Tucker Act and subjecting the CFAs to federal procurement laws such as the CICA. For the foregoing reasons, I respectfully dissent.